601 So.2d 1157 (1992)
Mark Allen GERALDS, Appellant,
v.
STATE of Florida, Appellee.
No. 75938.
Supreme Court of Florida.
April 30, 1992.
Rehearing Denied August 17, 1992.
*1158 Nancy A. Daniels, Public Defender and W.C. McLain, Asst. Public Defender, Tallahassee, for appellant.
Robert A. Butterworth, Atty. Gen. and Mark C. Menser, Asst. Atty. Gen., Tallahassee, for appellee.
BARKETT, Justice.
Mark Allen Geralds appeals from convictions for first-degree murder and related offenses and sentences, including the death penalty.[1] We affirm his convictions and remand for resentencing following a new penalty phase hearing.
The convictions arise from events occurring on February 1, 1989, when eight-year-old Bart Pettibone arrived home from school and found his mother, Tressa Lynn Pettibone, beaten and stabbed to death on the kitchen floor. There were two stab wounds on the right side of Tressa Pettibone's neck and one fatal stab wound on the left side. The wounds were consistent with a knife found in the kitchen sink. The medical examiner found a number of bruises and abrasions on the head, face, chest, and abdomen of the victim caused by some form of blunt trauma. The examiner also determined that the victim's wrists had been bound with a plastic tie for at least twenty minutes prior to her death.
Blythe Pettibone, the victim's daughter, testified that several items of jewelry were missing from the home. Among these were a herringbone chain necklace and a pair of red-framed Bucci sunglasses. Kevin Pettibone, the victim's husband, testified that his wife's Mercedes automobile was missing. The automobile was later found in the parking lot of a nearby school. Cash in the amount of $7,000 hidden in the house was not taken.
Mark Geralds was a carpenter who had worked on the remodeling of the Pettibones's house. About one week prior to the murder, Tressa Pettibone and her children encountered Geralds in a shopping mall. Tressa Pettibone mentioned that her husband was out of town on business. Later, Geralds approached Bart at the video arcade. He asked when Bart's father would be back in town and when Bart and his sister left for and returned from school during the day.
Other circumstantial evidence linked Geralds to the crime: (1) at 2:00 p.m. on February 1, 1989, Geralds pawned a gold herringbone chain necklace. Serology testing revealed a stain on the necklace to be blood compatible with the victim's blood type and inconsistent with Geralds's; (2) Douglas Freeman, Geralds's grandfather, testified that on occasion Geralds would come by his house to take a shower. Freeman testified that Geralds came by at 11:30 a.m. on *1159 February 1, 1989, and asked to shower because he had been working on a fiberglass boat, a reason he had given in the past. When he left, Geralds stated that he was taking a pair of sunglasses to some friends; (3) Vickey Ward testified that Geralds gave her a pair of red Bucci sunglasses in late January or early February, 1989; (4) a pair of Nike shoes was seized from Geralds's residence. Evidence indicated that they could have made the tracks on the floor in the Pettibone house; (5) the plastic tie recovered from the victim's wrist matched the ties found in Geralds's car.
The jury found Geralds guilty of first-degree murder, armed robbery, burglary of a dwelling, and theft of an automobile. The jury recommended death for the homicide. The court concurred, finding no statutory or nonstatutory mitigating factors and four aggravating circumstances: (1) the homicide occurred during a burglary;[2] (2) the homicide was committed to avoid arrest;[3] (3) the homicide was especially heinous, atrocious, or cruel;[4] and (4) the homicide was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification.[5] The court sentenced Geralds as a habitual felony offender for the noncapital felonies.
After a thorough review of the record, we are satisfied that the evidence in this case was sufficient to sustain the jury verdict. However, Geralds raises numerous issues on appeal which he argues require reversal of his conviction for first-degree murder and the capital and noncapital sentences.
Geralds first claims that the court improperly denied two defense challenges for cause to prospective jurors and thereby forced Geralds to trial with jurors who were unable to fairly decide his case. The State argues that the trial judge did not abuse his discretion in refusing to strike jurors Moss and Farrell for cause. After reviewing the colloquy between counsel and the jurors in question, we find that the trial court did not abuse its discretion. Although both jurors had seen the media coverage reporting the homicide, their responses on voir dire do not fairly suggest that these jurors were incapable of setting aside this information and rendering a verdict based on the evidence presented at trial. See Bundy v. State, 471 So.2d 9, 20 (Fla. 1985), cert. denied, 479 U.S. 894, 107 S.Ct. 295, 93 L.Ed.2d 269 (1986).
Geralds also argues that the trial court erred in denying his motion for a change of venue and/or for a continuance because pretrial publicity prevented empaneling a fair and impartial jury. In Davis v. State, we reiterated that "[a]n application for change of venue is addressed to a court's sound discretion, and a trial court's ruling will not be reversed absent a palpable abuse of discretion." 461 So.2d 67, 69 (Fla. 1984) (emphasis added), cert. denied, 473 U.S. 913, 105 S.Ct. 3540, 87 L.Ed.2d 663 (1985); see, e.g., Gaskin v. State, 591 So.2d 917, 919 (Fla. 1991); Straight v. State, 397 So.2d 903, 906 (Fla.), cert. denied, 454 U.S. 1022, 102 S.Ct. 556, 70 L.Ed.2d 418 (1981); Manning v. State, 378 So.2d 274, 276 (Fla. 1979). Geralds has not demonstrated "palpable" abuse in the present case. Our review of the record reveals that all the jurors who served stated affirmatively and unequivocally that they could put aside any prior knowledge of the crime and decide the case solely on the evidence adduced at trial. We therefore reject Geralds's argument that the trial court erred in denying the motions for change of venue and for continuance.
Geralds next argues that the trial court erred in denying defense counsel access to field notes used by a State witness to refresh her memory during trial testimony. The record established that Laura Rouseau, a Florida Department of Law Enforcement crime laboratory analyst and the crime scene coordinator assigned to the case, refreshed her memory during direct examination from handwritten notes in response *1160 to a question about whether she had documented the brand of knives located in the kitchen. Defense counsel objected that these notes were not provided pursuant to Florida discovery rules and also requested access to the notes for use on cross-examination. The trial judge ruled that there had been no discovery violation because defense counsel had received the witness's formal report. However, after an in camera inspection, the court ordered the State to provide the defense with the single page of the notes that the witness had used when responding to the question about the knives.
Geralds argues that he was entitled to all of the witness's notes either under Florida Rule of Criminal Procedure 3.220(b)(1)(x), or pursuant to section 90.613, Florida Statutes (1989).[6]
Rule 3.220(b)(1)(x) provides for disclosure of "[r]eports or statements of experts made in connection with the particular case, including results of physical or mental examinations and of scientific tests, experiments or comparisons." Fla.R.Crim.P. 3.220(b)(1)(x). Geralds contends that because rule 3.220(b)(1)(ii)[7] specifically excludes police notes from the definition of "statements" as used in that paragraph, the legislature therefore intended to include the notes of other experts within the definition of "statements" in paragraph (b)(1)(x).
The relevant part of rule 3.220(b)(1)(ii) states:
The term "statement" as used herein includes a written statement made by said person and signed or otherwise adopted or approved by him, and also includes any statement of any kind or manner made by such person and written or recorded or summarized in any writing or recording. The term "statement" is specifically intended to include all police and investigative reports of any kind prepared for or in connection with the case but shall not include the notes from which such reports are compiled.

Fla.R.Crim.P. 3.220(b)(1)(ii) (emphasis added).
The plain language quoted above clearly dictates that police and investigative reports are discoverable but that "notes from which such reports are compiled" are not discoverable. Here, the witness in question was a police officer testifying to what she found at the scene of the crime. Geralds therefore cannot argue for disclosure of that witness's field notes under paragraph (b)(1)(x) when such notes are specifically exempted from disclosure under paragraph (b)(1)(ii).
Geralds's second contention is that defense counsel was entitled to all of the witness's field notes pursuant to section 90.613, Florida Statutes (1989), which provides:
When a witness uses a writing or other item to refresh his memory while testifying, an adverse party is entitled to have such writing or other item produced at the hearing, to inspect it, to cross-examine the witness thereon, and to introduce it, or, in the case of a writing, to introduce those portions which relate to the testimony of the witness, in evidence. If it is claimed that the writing contains matters not related to the subject matter of the testimony, the judge shall examine the writing in camera, excise any portions not so related, and order delivery of the remainder to the party entitled thereto. Any portion withheld over objection shall be preserved and made available to the appellate court in the event of an appeal. If a writing or other item is not produced or delivered pursuant to order under this section, the testimony of the witness concerning those matters shall be stricken.
*1161 Geralds argues that all of the field notes were "related to the subject matter" of the witness's testimony (i.e., the witness's examination of the crime scene) and therefore the trial court erred in only providing that page of the witness's notes relating to the knives. In fact, the record reveals that the trial judge followed the exact letter of the rule by holding an in camera inspection and then excising those portions of the notes that in his view were not related to the precise subject matter of the witness's testimony. Although the trial court's interpretation of the rule may have been somewhat restrictive, we do not find an abuse of discretion.[8]
Turning to the penalty phase, we find that one issue raised by Geralds entitles him to a new sentencing hearing.
Geralds argues that the trial court erred in permitting the prosecutor to use references to Geralds's prior criminal convictions to impeach defense mitigation witness Dana Wilson. On direct examination, Wilson testified that Geralds had been his neighbor for a one-year period three years prior to trial. Wilson stated that he never had any confrontations with Geralds and that Geralds often played with Wilson's young children. On cross-examination, the prosecutor sought to impeach Wilson by asking if he was aware of Geralds's criminal record. The questioning began as follows:
Q. Are your aware of his prior criminal convictions?
A. Only what I read in the paper.
Q. Do you know how many times he's been convicted of a crime?
A. I do not know how many times, no.
Q. If you knew that he was convicted eight times....
At that point defense counsel objected and moved for a mistrial. In response, after argument, the court prohibited questioning concerning the specific number of convictions and gave a curative instruction to the jury to disregard the question. Nevertheless, the court allowed the prosecutor to reask the question using the phrase "multiple convictions." Accordingly, the prosecutor asked:
Q. Mr. Wilson, if you knew that the defendant had multiple criminal convictions of felonies, would this change your opinion of him?
Defense counsel again objected to the question as rephrased on the ground that the witness had not testified to his opinion of Geralds on direct. The court overruled the objection.
The State concedes that it agreed not to offer any penalty phase evidence and to rest on the guilt phase evidence in reliance on defense counsel's promise not to present evidence regarding the statutory mitigating factor relating to the absence of a significant criminal record.[9] However, the State contends that the defendant's direct examination of Wilson constituted such evidence and opened the door to rebuttal. We cannot agree.
The sum of Wilson's testimony was that Geralds had played with Wilson's children and that he personally had never had a confrontation with Geralds.[10] Accordingly, *1162 the State was not entitled to impeach Wilson by inquiring into his knowledge of Geralds's criminal record because no predicate was laid for such impeachment. We therefore agree with Geralds that the trial court committed error in permitting the prosecutor to question Wilson regarding Geralds's prior convictions.
Having determined that the trial court erred, that error is subject to harmless error analysis. In criminal cases, the burden is on the State to prove beyond a reasonable doubt that the error complained of did not contribute to the jury's recommendation of death. See State v. DiGuilio, 491 So.2d 1129, 1135 (Fla. 1986). The State cannot meet that burden in this case.
The error in this case was two-fold. Most egregious was the State's question regarding Geralds's eight prior felony convictions. Although the judge gave a so-called "curative" instruction for the jury to disregard the question, such instructions are of dubious value. Once the prosecutor rings that bell and informs the jury that the defendant is a career felon, the bell cannot, for all practical purposes, be "unrung" by instruction from the court. See Malcolm v. State, 415 So.2d 891, 892 n. 1 (Fla. 3d DCA 1982) (labeling such an instruction as being "of legendary ineffectiveness").
Second, the error was hardly ameliorated by then allowing the prosecutor to ask about Geralds's multiple convictions. As we have already said, the entire line of questioning should never have occurred because the defense had not opened the door to such impeachment on direct examination.
This Court has long held that aggravating circumstances must be limited to those provided for by statute. E.g., Wike v. State, 596 So.2d 1020 (Fla. 1992); McCampbell v. State, 421 So.2d 1072, 1075 (Fla. 1982); Miller v. State, 373 So.2d 882, 885 (Fla. 1979). In particular, a defendant's convictions for nonviolent felonies are inadmissible evidence of nonstatutory aggravating circumstances. See Maggard v. State, 399 So.2d 973, 977-78 (Fla.), cert. denied, 454 U.S. 1059, 102 S.Ct. 610, 70 L.Ed.2d 598 (1981).
Our decision in Maggard is directly on point. In Maggard we held that the State's presentation of evidence of the defendant's prior criminal record of nonviolent crimes to rebut the mitigating circumstance of no significant prior criminal activity, upon which the defendant has explicitly waived reliance, constituted reversible error. 399 So.2d at 977-78. We characterized that error as being "of such magnitude as to require a new sentencing hearing before the jury and court." Id. at 977.
The effect of this impermissible colloquy regarding Geralds's prior record is of the same magnitude today as it was in Maggard ten years ago. The State is not permitted to present otherwise inadmissible information regarding a defendant's criminal *1163 history under the guise of witness impeachment. This rule is of particular force and effect during the penalty phase of a capital murder trial where the jury is determining whether to recommend the death penalty for the criminal accused. Improperly receiving vague and unverified information regarding a defendant's prior felonies clearly has the effect of unfairly prejudicing the defendant in the eyes of the jury and creates the risk that the jury will give undue weight to such information in recommending the penalty of death.
We thus find that permitting the prosecution to question Dana Wilson regarding Geralds's prior nonviolent felonies was reversible error. We cannot say that there is no reasonable possibility that this error did not contribute to the jury's recommendation. See DiGuilio, 491 So.2d at 1135; Maggard, 399 So.2d at 977; cf. Robinson v. State, 487 So.2d 1040, 1042 (Fla. 1986) (finding prejudicial the State's use of uncharged crimes to undermine the credibility of the defendant's character witness).
Because we are remanding for a new penalty phase hearing, it is unnecessary for us to address the other issues raised by Geralds on appeal. However, in order to avoid future problems in resentencing, we address Geralds's claims regarding two of the aggravating factors found by the trial court.
Geralds argues that the court erred in finding that the homicide was committed to avoid arrest and that the homicide was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification.
To establish the heightened premeditation required for a finding that the murder was committed in a cold, calculated, and premeditated manner, the evidence must show that the defendant had a "careful plan or prearranged design to kill." Rogers v. State, 511 So.2d 526, 533 (Fla. 1987) (emphasis added), cert. denied, 484 U.S. 1020, 108 S.Ct. 733, 98 L.Ed.2d 681 (1988). A plan to kill cannot be inferred solely from a plan to commit, or the commission of, another felony. Jackson v. State, 498 So.2d 906, 911 (Fla. 1986); Hardwick v. State, 461 So.2d 79, 81 (Fla. 1984), cert. denied, 471 U.S. 1120, 105 S.Ct. 2369, 86 L.Ed.2d 267 (1985). As we said in Hardwick:
The premeditation of a felony cannot be transferred to a murder which occurs in the course of that felony for purposes of this aggravating factor. What is required is that the murderer fully contemplate effecting the victim's death. The fact that a robbery may have been planned is irrelevant to this issue.
461 So.2d at 81.
It is axiomatic that the State is required to establish the existence of an aggravating circumstance beyond a reasonable doubt. State v. Dixon, 283 So.2d 1, 9 (Fla. 1973), cert. denied, 416 U.S. 943, 94 S.Ct. 1950, 40 L.Ed.2d 295 (1974). The evidence in this case is entirely circumstantial. Consequently, to satisfy the burden of proof, the circumstantial evidence must be inconsistent with any reasonable hypothesis which might negate the aggravating factor. Eutzy v. State, 458 So.2d 755, 758 (Fla. 1984), cert. denied, 471 U.S. 1045, 105 S.Ct. 2062, 85 L.Ed.2d 336 (1985).
The State contends that the evidence at trial established more than simple premeditation. The State argues that Geralds planned the crime for a week after interrogating the Pettibone children in the mall; Geralds ascertained when family members would be present in the house; Geralds brought gloves, a change of clothes, and plastic ties with him to the house; Geralds left his car at a location away from the house so that no one would see it or identify it later; Geralds bound and stabbed his victim.
Geralds argues that this evidence establishes, at best, an unplanned killing in the course of a planned burglary, and that a planned burglary does not necessarily include a plan to kill. Geralds offers a number of reasonable hypotheses which are inconsistent with a finding of heightened premeditation. Geralds argues, first, that he allegedly gained information about the family's schedule to avoid contact with anyone during the burglary; second, the *1164 fact that the victim was bound first rather than immediately killed shows that the homicide was not planned; third, there was evidence of a struggle prior to the killing; and fourth, the knife was a weapon of opportunity from the kitchen rather than one brought to the scene.
Thus, although one hypothesis could support premeditated murder, another cohesive reasonable hypothesis is that Geralds tied the victim's wrists in order to interrogate her regarding the location of money which was hidden in the house. However, after she refused to reveal the location, Geralds became enraged and killed her in sudden anger. Alternatively, the victim could have struggled to escape and been killed during the struggle.
In light of the fact that the evidence regarding premeditation in this case is susceptible to these divergent interpretations, we find the State has failed to meet its burden of establishing beyond a reasonable doubt that this homicide was committed in a cold, calculated, and premeditated manner. Consequently, the trial court erred in finding this aggravating circumstance.
Likewise, we agree with Geralds that the State has failed to prove the existence of the aggravating circumstance of witness elimination beyond a reasonable doubt. The trial court found as follows:
The evidence establishes that the [d]efendant had worked around the victim's home and was known by the victim, the victim's spouse and her children. The evidence established that the defendant had spoken with the victim and her two children the week prior to the murder and at that time sought out information concerning the family's time schedule and the fact that the victim's husband would be out of town on the date the crime was committed. This evidence is clear to establish that the victim could have identified the defendant if she had survived the beating she was subjected to and the stabbing that occurred during the course of the robbery and burglary.
We have repeatedly held that the avoiding arrest aggravating factor is not applicable unless the evidence proves that the only or dominant motive for the killing was to eliminate a witness. E.g., Perry v. State, 522 So.2d 817, 820 (Fla. 1988); Floyd v. State, 497 So.2d 1211, 1214-15 (Fla. 1986); Riley v. State, 366 So.2d 19, 21-22 (Fla. 1978). The mere fact that the victim knew and could identify the defendant, without more, is insufficient to prove this aggravating factor beyond a reasonable doubt. E.g., Perry, 522 So.2d at 820; Floyd, 497 So.2d at 1214-15; Caruthers v. State, 465 So.2d 496, 499 (Fla. 1985); Rembert v. State, 445 So.2d 337, 340 (Fla. 1984). We therefore find that the trial court erred in finding that this homicide was committed for the purpose of witness elimination.
Accordingly, we affirm Geralds's convictions but remand for resentencing following a new penalty phase hearing.
It is so ordered.
SHAW, C.J., and OVERTON, McDONALD and KOGAN, JJ., concur.
GRIMES, J., concurs with an opinion, in which SHAW, C.J., and HARDING, J., concur.
HARDING, J., concurs with conviction, but concurs in result only with sentence.
GRIMES, Justice, concurring.
I agree that the prosecutor's reference to prior convictions requires a new penalty phase hearing. However, I believe the evidence justifies a finding that the homicide was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification.
Geralds carefully planned this crime. In talking with the Pettibone children, he learned when Mr. Pettibone would return and when the children would not be at home. He parked his car away from the house so as to avoid identification. He wore gloves and brought plastic ties with him to the house. Mrs. Pettibone was bound with the ties for at least twenty minutes before she was killed. The fact that Geralds brought a change of clothing with him suggests that he knew he would need to dispose of bloody clothing after the murder. Because Mrs. Pettibone knew *1165 who he was, he must have reasoned that he would have to kill her in order to escape detection.
It is obvious that Geralds intended to encounter the victim because he brought the ties with him to the house. The hypothesis that Geralds killed her after becoming enraged because she refused to reveal the location of hidden money is nothing more than conjecture. Assuming that he was looking for the money, it is apparent that he was willing to kill her if necessary in order to find its location. The evidence demonstrates the heightened premeditation necessary to sustain this aggravating circumstance.
SHAW, C.J., and HARDING, J., concur.
NOTES
[1] We have jurisdiction pursuant to article V, section 3(b)(1) of the Florida Constitution.
[2] § 921.141(5)(d), Fla. Stat. (1989).
[3] Id. § 921.141(5)(e).
[4] Id. § 921.141(5)(h).
[5] Id. § 921.141(5)(i).
[6] As noted above, and contrary to Geralds's assertion on appeal, the record reflects that the trial court did conduct the appropriate inquiry under Richardson v. State, 246 So.2d 771 (Fla. 1971), in response to defense counsel's objection.
[7] Paragraph (b)(1)(ii) provides for disclosure of statements made by any person "known to the prosecutor to have information which may be relevant to the offense charged, and to any defense with respect thereto." Fla.R.Crim.P. 3.220(b)(1)(i).
[8] We note that the brand name of the knife used in the attack was never an "issue" at trial.
[9] See § 921.141(6)(a), Fla. Stat. (1989). The parameters of the agreement are not entirely clear from the record.
[10] Dana Wilson testified as follows:

Q. I ask you, do you know this young man right here, Mark Allen Geralds?
A. I do.
Q. Would you just tell these folks briefly how you know him?
A. I live on Georgia Avenue in Lynn Haven. He lived next door to me for a year with his parent.
Q. Now, sir, I will interrupt you at that point. About when was that that he lived as your neighbor?
A. I believe it was about three years ago.
Q. And you had an occasion to live next to him for approximately a year?
A. That's correct.
Q. During that period of time would you just tell us about Mark Geralds, whether y'all visited or anything like that?
A. We did visit each other. His dad and I were friends. I would go over and eat in the yard with them. Mark would be out washing his car and my two children would call at him, or call at him, he would come over and play with my children. Swing my little girl on the swing set and play baseball with my son.
Q. About how old are your children?
A. Well, how old were they at that time. At that time my girl was probably five, my boy was ten.
Q. Have you had an occasion to see him other than today after he no longer was your neighbor?
A. Probably two or three times since the time he lived or moved away from Georgia Avenue.
Q. During that period of time that he was your neighbor, did you ever notice any evidence of violent nature or confrontational nature of Mark?
A. I never saw him, I never had the first confrontation with him. I never had any problems with him getting rowdy or anything with my children.
Q. And he was considerably older than your children at that time?
A. Yes.
Q. Are you aware of his family situation with regard to his mother and father?
A. I had ... I wasn't nosey or anything. We knew there had been a divorce in the family before they moved next door.
Q. Is there anything else that you can tell us that might help these folks understand what kind of a young man Mark Geralds is? Is that ... or is that about the extent?
A. Well, that's pretty much the extent. He was a neighbor for a year. I never had any problems. He's been in my house several times when I was there and when I wasn't there visiting my children and my wife.
Q. I thank you. I have no further questions.