926 So.2d 1203 (2006)
John M. BUZIA, Appellant,
v.
STATE of Florida, Appellee.
No. SC04-582.
Supreme Court of Florida.
March 23, 2006.
*1206 James S. Purdy, Public Defender and George D.E. Burden, Assistant Public Defender, Seventh Judicial Circuit, Daytona Beach, FL, for Appellant.
Charles J. Crist, Jr., Attorney General, Tallahassee, FL, and Barbara C. Davis, Assistant Attorney General, Daytona Beach, FL, for Appellee.
PER CURIAM.
We review appellant John M. Buzia's appeal of a circuit court judgment sentencing him to death. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. As we explain below, we affirm.

I. FACTS AND PROCEDURAL BACKGROUND
Buzia was indicted on charges of the first-degree murder of Charles Kersch, attempted first-degree murder of Thea Kersch, armed burglary of a dwelling with an assault or battery, and robbery with a deadly weapon. Trial was held in March 2003.

A. The Guilt Phase
The Kersches, both 71 years old and retired, lived in a gated community. In the past, Buzia had performed odd jobs around their residence and rental properties. On the morning of March 14, 2000, Charles Kersch and his wife Thea expected Buzia at their residence for work, but he did not appear. In a videotaped interview with the police, Buzia stated that he had a "money issue" with the Kersches and, on that day, decided to steal money from them.
Buzia arrived at the residence at about 2:30 p.m. He waited twenty minutes for someone to arrive. Mrs. Kersch arrived home between 4 and 4:30 p.m. Buzia told her that his brother had been beaten up and that he needed to talk to her husband. She allowed him to wait in the enclosed patio area until Mr. Kersch returned.
On the patio, Buzia retrieved a serving tray he found and approached the sliding glass door that led into the kitchen. Mrs. Kersch opened the door, and he handed it to her. Once she placed the tray on a table inside, Buzia entered. They briefly conversed. Mrs. Kersch said nothing to upset him. Yet, without warning, Buzia struck her several times with his fist. Blood sprayed from her nose. Buzia admitted that he was trying to make her unconscious so that he could take her money. He knocked her down and kicked her. She lost consciousness. He took her keys and removed about $80 from her purse. He dragged her into the back bedroom and covered her with a blanket. Then he searched the house and removed a Mastercard from her purse.
Buzia then heard the garage door open and assumed that Mr. Kersch had arrived home. He considered at this point whether he should tell Mr. Kersch that he had attacked his wife, or whether he should assault him, too, and leave. As soon as Mr. Kersch entered the house through the garage entrance, Buzia hit him with his *1207 fist, causing him to fall on the floor and hit his head on the tile. Mr. Kersch was breathing, but bleeding severely. Buzia told the police, "I was ... thinking ... you know ... he's gonna die, if [I] leave right now." Mr. Kersch attempted to rise to his feet, getting up on his hands and knees. Buzia stated that his "intention was ... obviously to keep him down longer, so maybe [he] could drive away and get more time." He was "committed" at this point. He struck him again with his fist, and Mr. Kersch again fell to the floor. He removed about $100 from Mr. Kersch's wallet.
Buzia obtained one of the two axes from the garage. He thought about "using it to make `em unconscious" but then "threw it on the ... puddle of mess." He claims he never hit Mr. Kersch with that ax. However, after hearing moaning and groaning from Mrs. Kersch in the back bedroom, he went to the garage a second time and returned with another ax. It is unclear which ax he used on the Kerschesthe first one or the second one. It seems that he used the second one and hit Mr. Kersch once in the head with the flat side of it. He stated that his intention in hitting Mr. Kersch with the ax was to "slow him" and "put him out." In the back bedroom, Mrs. Kersch was awake and attempting to get up, but he also hit her once with the same flat side of the ax. She lost consciousness again.
He covered Mr. Kersch with a blanket, and he duct-taped the door handle in the back bedroom where Mrs. Kersch lay unconscious. After looking in closets and other things, he tried to clean up the residence a little bit, but he admitted that it was "overwhelming." Buzia then took Mr. Kersch's car keys and one of his T-shirts. He changed his shirt because it was "nasty" and "dirty." The Kersches were both moving, moaning, and groaning when he left. He drove away in Mr. Kersch's car. Shortly thereafter, the paramedics arrived. Mrs. Kersch survived, but Mr. Kersch died of blunt force injuries to the head.
The following morning, the police arrested Buzia at a bank after he attempted to cash a check for $830 drawn from Mr. Kersch's account. Buzia appeared to understand the officers' commands, did not have any trouble walking, and did not resist the officers' efforts to search him.
Investigators found Mr. Kersch's body lying near the garage door and covered with a blanket. They also found a single-headed ax on the chair at the dinette table inside the house and a double-headed ax behind the couch. The medical examiner also testified regarding the various injuries Mr. Kersch suffered and the causes of those injuries.
The jury found Buzia guilty of the first-degree premeditated murder of Mr. Kersch, the attempted first-degree murder of Mrs. Kersch, armed burglary of a dwelling with an assault or battery, and robbery with a deadly weapon.

B. The Penalty Phase
At the penalty phase, Buzia presented several lay witnesses, as well as a psychologist, who testified about his problems with drugs and alcohol, including his cocaine dependence. The State rebutted this evidence with its own expert, who stated that Buzia's actions suggested goal-directed and purposeful behavior. The jury, by a vote of eight to four, recommended the death penalty.
After the Spencer[1] hearing, the trial court issued its sentencing order, in which it found that the evidence supported the following six aggravating circumstances: (1) that Buzia was previously convicted of *1208 another capital offense or of a felony involving the use of violence to some person; (2) that the murder was committed while he was engaged in the commission of or flight after committing or attempting to commit the crime of kidnapping; (3) that the murder was committed for the purpose of avoiding or preventing a lawful arrest or effecting an escape from custody; (4) that the murder was committed for financial gain; (5) that the murder was especially heinous, atrocious, or cruel ("HAC"); and (6) that the murder was committed in a cold, calculated, and premeditated manner, and without any pretense of moral or legal justification ("CCP"). However, the court assigned great weight to only four aggravatorsprior violent felony, avoid-arrest, HAC, and CCP. The court did not consider the other twoduring the course of a robbery/burglary/kidnapping and pecuniary gain.
After reviewing the record for mitigation, the court assigned little weight to two factors under the statutory catchall provision, section 921.141(6)(h), Florida Statutes (2003), specifically Buzia's interaction with the community and his work record. The court also found seven nonstatutory mitigating factors and ascribed weight as follows: (1) influence of a mental or emotional disturbance, not extreme in nature (substantial weight); (2) Buzia's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired, but not substantially (substantial weight); (3) gainful employment (little weight); (4) appropriate courtroom behavior during the guilt and penalty phases of the trial and during the Spencer hearing (little weight); (5) cooperation with law enforcement (little weight); (6) difficult childhood (little weight); and (7) remorse (little weight). The trial court concluded that the aggravating circumstances outweighed the mitigation and sentenced Buzia to death. In addition, the court sentenced Buzia to three concurrent life sentences for the attempted first-degree murder, armed burglary, and armed robbery convictions.

II. THE ISSUES ON APPEAL
Buzia raises six issues on appeal, which we address in turn below: (A) the trial court erred in finding the prior violent felony aggravating circumstance; (B) the trial court erred in finding the avoid-arrest aggravating circumstance; (C) the trial court erred in finding the HAC aggravating circumstance; (D) the trial court erred in finding the CCP aggravating circumstance; (E) the death penalty is not warranted in this case; and (F) Florida's capital sentencing procedures violate Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). We also independently determine that the evidence was sufficient to convict Buzia of first-degree murder.[2]

A. Prior Violent Felony Aggravating Circumstance
In his first claim, Buzia challenges the trial court's finding of the prior violent felony aggravator. He argues that his contemporaneous guilty verdict for the attempted murder of Mrs. Kersch was not a "conviction" under section 921.141(5)(b), Florida Statutes (2003). However, Buzia failed to preserve this issue for appeal. See Harrell v. State, 894 So.2d 935, 940 (Fla.2005) ("[A] litigant must make a timely, contemporaneous objection."). Although he filed pretrial motions contesting the application of this aggravator, those objections were not contemporaneous with the penalty phase. In his sentence memorandum, *1209 Buzia objected to the other aggravators, but he did not raise any arguments regarding the prior violent felony aggravator. Accordingly, this issue was not preserved.
This claim lacks merit anyway. Section 921.0011(2), Florida Statutes (2001), defines "conviction" as a "determination of guilt that is the result of a plea or a trial, regardless of whether adjudication is withheld." (Emphasis added.) "The word `convicted' as used in section 921.141(5)(b) means a valid guilty plea or jury verdict of guilty for a violent felony; an adjudication of guilt is not necessary...." McCrae v. State, 395 So.2d 1145, 1154 (Fla.1980) (emphases added). Furthermore, we have long recognized that a contemporaneous conviction for a violent felony can serve as a basis for the prior violent felony aggravator. LeCroy v. State, 533 So.2d 750, 755 (Fla.1988); Correll v. State, 523 So.2d 562, 568 (Fla.1988).
Buzia's argument rests on the incorrect assumption that, for purposes of this aggravator, a conviction requires adjudication. Under section 921.0011(2) and McCrae, the jury determined Buzia's guilt as to the attempted murder of Mrs. Kersch at the end of the guilt phase and, thus, "convicted" him of that crime. Adjudication was unnecessary. The jury's guilty verdict for the attempted murder of Mrs. Kersch was a "conviction" for purposes of the prior violent felony aggravator. Accordingly, we affirm the trial court's finding.

B. Avoid-Arrest Aggravating Circumstance
In his second claim, Buzia challenges the trial court's finding of the avoid-arrest aggravator. He argues that (1) he did not intentionally kill Mr. Kersch; and (2) the evidence in support of this aggravator was circumstantial and inconclusive. Buzia's contention and accompanying arguments that he did not intend to kill Mr. Kersch attempt to reargue the merits of his first-degree murder conviction.[3] At trial, the jury found Buzia guilty of first-degree murder and based its finding on both felony murder and premeditated murder. This latter finding establishes intent.
The correct question is whether competent, substantial evidence supports the trial court's finding that Buzia murdered Mr. Kersch to avoid arrest. "[O]ur task on appeal is to review the record to determine whether the trial court applied the right rule of law for each aggravating circumstance and, if so, whether competent substantial evidence supports its finding." Owen v. State, 862 So.2d 687, 698 (Fla. 2003) (quoting Way v. State, 760 So.2d 903, 918 (Fla.2000)). We have outlined the appropriate circumstances for finding the avoid-arrest aggravator:

Where the victim is not a police officer, "the evidence [supporting the avoid arrest aggravator] must prove that the sole or dominant motive for the killing was to eliminate a witness," and "[m]ere speculation on the part of the state that witness elimination was the dominant motive behind a murder cannot support the avoid arrest aggravator." *1210 However, this factor may be proved by circumstantial evidence from which the motive for the murder may be inferred, without direct evidence of the offender's thought processes.

In other cases, this Court has found it significant that the victims knew and could identify their killer. While this fact alone is insufficient to prove the avoid arrest aggravator, we have looked at any further evidence presented, such as whether the defendant used gloves, wore a mask, or made any incriminating statements about witness elimination; whether the victims offered resistance; and whether the victims were confined or were in a position to pose a threat to the defendant.

Parker v. State, 873 So.2d 270, 289 (Fla. 2004) (quoting Farina v. State, 801 So.2d 44, 54 (Fla.2001)). Buzia argues that the circumstantial evidence is too inconclusive to support this aggravator, while the State asserts that direct evidence of Buzia's thought processes exists to support it.[4] We address each of these arguments in turn.
First, Buzia relies heavily on Zack v. State, 753 So.2d 9 (Fla.2000), arguing that similar circumstances in that case did not warrant application of this aggravator. In Zack, the defendant and the victim returned to the victim's home after meeting at a bar. The defendant hit the victim with a beer bottle, sexually assaulted her, and beat her head against the bedroom's wooden floor. He retrieved a knife from the kitchen and stabbed her in the chest four times. The defendant went back to the kitchen, cleaned the knife, put it away, and washed the blood from his hands. He then returned to the master bedroom, placed the victim's bloody shirt and shorts in her dresser drawer, stole a television, a VCR, and the victim's purse, and placed the stolen items in her car and drove away. Id. at 14. We concluded that the evidence was inconclusive to support the avoid-arrest aggravator because the defendant had a larger "premeditated plan" in mind. Id. at 20. The defendant's acts were part of a "crime-riddled journey" in which he had committed a variety of assaults and robberies against other victims. Id. at 13-14. Although he did not have to murder the victim "to accomplish his monetary goals, this alone does not make the defendant's dominant motive the desire to avoid arrest." Id. at 20.
This case is distinguishable from Zack. Unlike the defendant in Zack, Buzia was not on a "crime-riddled journey." His actions involved one robbery at one location. Furthermore, aside from not having to murder Mr. Kersch "to accomplish his monetary goals," additional circumstances (which were absent in Zack) prove that Buzia killed him to avoid arrest.
We agree with the State that Willacy v. State, 696 So.2d 693 (Fla.1997), is more similar to this case. In Willacy, the defendant bludgeoned the victim and tied her hands and feet together. Id. at 696. Because the victim no longer posed an immediate threat to him, and because she was his next-door neighbor and could identify *1211 him easily, we concluded that he had little reason to kill her except to eliminate her as a witness. Id. Buzia, too, easily subdued his victim. Mr. Kersch, an elderly man who was injured and bleeding badly, no longer posed an immediate threat to Buzia. He "was incapable of thwarting [Buzia's] purpose or of escaping and could not summon help." Id. Buzia went to the garage not once, but possibly twice, to obtain an ax, which indicates that he had enough time to escape undetected with the Kersches' money and valuables. There was little reason for Buzia to hit Mr. Kersch with an ax, except to kill him so Buzia could avoid arrest.
In addition to these circumstances, Buzia's incriminating statements to the police evidence his thought processes. We have found that a defendant's statements to the police, in part, support a finding of the avoid-arrest aggravator. Derrick v. State, 641 So.2d 378, 380 (Fla.1994) ("In a statement to the [police], [the defendant] indicated that the victim recognized him and that he killed the victim to `shut him up.'"). Buzia told the police that his "intention [in hitting Mr. Kersch the second time with his fist] was ... obviously to keep him down longer, so maybe [he] could drive away and get more time." He admitted that, after doing so, he thought Mr. Kersch was going to die: "I was ... thinking... you know ... he's gonna die, if [I] leave right now." Even more relevant is his statement to the police regarding why he used the axthe instrument that ultimately killed Mr. Kersch. Buzia stated that his intention in hitting him with it was to "slow him" and "put him out."
In addition, Buzia admitted that, when he heard Mr. Kersch arrive, he considered whether or not he should tell him that he had hurt his wife, or instead attack him as well. He obviously decided on the latter course, most likely because it would help him escape undetected. These admissions prove that Buzia's intent to avoid arrest extends beyond mere speculation. His "sole or dominant" motive for murdering Mr. Kersch was to eliminate him as a witness. We find no error in the trial court's finding of the avoid-arrest aggravator.

C. HAC Aggravating Circumstance
In his third claim, Buzia challenges the trial court's finding that the murder of Mr. Kersch was heinous, atrocious, or cruel. To qualify for this aggravator, "the crime must be both conscienceless or pitiless and unnecessarily torturous to the victim." Hertz v. State, 803 So.2d 629, 651 (Fla.2001) (quoting Richardson v. State, 604 So.2d 1107, 1109 (Fla.1992)). Buzia raises two grounds for the trial court's error: he never intended to kill or torture Mr. Kersch; and Mr. Kersch was not acutely aware of impending death.[5] The State responds that because the murder of Mr. Kersch was a beating, the HAC aggravator applies.
Buzia's reliance on intent is misplaced. "The intention of the killer to inflict pain ... is not a necessary element of the aggravator." Francis v. State, 808 So.2d 110, 135 (Fla.2001) (emphasis added) (quoting Guzman v. State, 721 So.2d 1155, 1160 (Fla.1998)). We have upheld a finding of the HAC aggravator where "the killer was utterly indifferent to the suffering of another." Id. (quoting Guzman, 721 So.2d at 1160) "[The HAC aggravator] focuses on the means and manner in which death is inflicted and the immediate circumstances *1212 surrounding the death...." Barnhill v. State, 834 So.2d 836, 849-50 (Fla.2002) (emphasis added); see also Brown v. State, 721 So.2d 274, 277 (Fla. 1998). "[T]he focus should be upon the victim's perceptions of the circumstances." Lynch v. State, 841 So.2d 362, 369 (Fla. 2003) (emphasis added) (citing Farina, 801 So.2d at 53); see also Hitchcock v. State, 578 So.2d 685, 692 (Fla.1990) ("That [the defendant] might not have meant the killing to be unnecessarily torturous does not mean that it ... was not unnecessarily torturous and, therefore, not [HAC]."). None of Buzia's arguments regarding intent have any merit.[6] Our analysis focuses on "the means and manner" in which Buzia killed Mr. Kersch and Mr. Kersch's perceptions of the circumstances. Therefore, we address the following two issues: (1) whether the murder of Mr. Kersch was a beating; and (2) whether Mr. Kersch was acutely aware of impending death.
We have upheld the HAC aggravator in numerous cases involving beatings. Lawrence v. State, 698 So.2d 1219, 1221-22 (Fla.1997) ("We have consistently upheld HAC in beating deaths."); see also, e.g., Colina v. State, 634 So.2d 1077, 1081 (Fla. 1994) (holding that the HAC aggravator applied where one of the defendants hit the victim, who fell to the ground, and when that victim attempted to get to his feet, the other defendant hit him several times in the back of the head with a tire iron); Owen v. State, 596 So.2d 985, 990 (Fla.1992) (upholding the HAC aggravator where the sleeping victim was struck on the head and face with five hammer blows); Lamb v. State, 532 So.2d 1051, 1053 (Fla.1988) (upholding the HAC aggravator where the defendant struck the victim six times in the head with a claw hammer, pulled his feet out from under him, and kicked him in the face); Heiney v. State, 447 So.2d 210, 216 (Fla.1984) (upholding the HAC aggravator where seven severe hammer blows were inflicted on the victim's head).
A crime scene analyst concluded that the blood spatter on the wall near Mr. Kersch's body was the "result of a beating." Based on those blood stains and patterns, she also concluded that there were at least two separate swings of the ax and two separate impacts to Mr. Kersch's head. In addition, Buzia stated to the police that he twice knocked Mr. Kersch to the floor.
Although the beatings in Heiney, Owen, and Lamb were probably more severe than this one, these facts parallel the circumstances in Colina. In that case, one of the defendants hit the victim, who fell to the ground. At that point, the co-defendant administered several blows with a tire iron to the back of the head. 634 So.2d at 1081. We conclude the attack on Mr. Kersch amounts to a "beating" for purposes of the HAC aggravator.
Nevertheless, nothing done to the victim after the victim is dead or unconscious can support this aggravator. Zakrzewski v. State, 717 So.2d 488, 493 (Fla.1998); see also Jones v. State, 569 So.2d 1234, 1238 (Fla.1990); Jackson v. State, 451 So.2d 458, 463 (Fla.1984). Therefore, awareness of impending death is critical in determining whether a beating unnecessarily tortured the victim. See *1213 Cox v. State, 819 So.2d 705, 720 (Fla.2002) (noting that "a victim's suffering and awareness of his or her impending death... supports the ... [HAC] aggravating circumstance where there is a merciless attack and beating"); see also Colina, 634 So.2d at 1081 (upholding the HAC aggravator where one of the victims moaned, and the defendant dealt her several more blows); Owen, 596 So.2d at 990 (upholding the HAC aggravator where, after being struck on the head with a hammer, the sleeping victim awoke screaming and struggling and endured several more blows); Lamb, 532 So.2d at 1053 (upholding the HAC aggravator where, after being struck six times in the head with a claw hammer, the victim did not die instantaneously but fell to his knees and to the floor and moaned, and the defendant kicked him in the face).
Buzia argues that the murder happened quickly, and therefore Mr. Kersch was not conscious during the attack or aware of his fate. At oral argument, Buzia's counsel insisted that the medical examiner's testimony about the circumstances surrounding Mr. Kersch's death contradicted Buzia's statement to the police that Mr. Kersch attempted to get up on his hands and knees. We discern no such conflict. The medical examiner found, in addition to bruising on Mr. Kersch's right hand, significant injuries in three areas: (1) lacerations in three places on the right side of his headabove the right ear, to the right of his eyebrow, and on the side of his nosewith abundant hemorrhaging underneath the injury just above his eye; (2) a laceration of the scalp on the back of his head with marked hemorrhaging and, underneath that, a large amount of accumulated blood and a small skull fracture; and (3) on the left side of his head, a large complex laceration (including fractured skull bones underneath) with superficial abrasion and some soft tissue hemorrhage.
The medical examiner concluded that the laceration on Mr. Kersch's eye was consistent with the blunt force of being hit with a fist and inconsistent with a blow from an ax. The laceration above his right ear was less consistent with a blow from a fist, but he would not rule it out. Regarding the second injurythe laceration, hemorrhage, and skull fracture on the back of Mr. Kersch's headhe stated that it was consistent with an ax or "a really rapid fall to the floor could cause this kind of injury." It was "possible, but not necessarily likely" that this injury caused death. It "would very possibly have caused unconsciousness," but it "may not have." The examiner testified that, if Mr. Kersch had lost consciousness as a result of this injury, he might have regained it. In addition, he speculated that the third injury could have resulted from either one blow or separate blows. The contusion in that area was consistent with either being struck by an ax or falling and hitting one's head on the floor. The skull bone fractures underlying the "gash" or laceration were consistent with a blow from the flat side of an ax but not consistent with hitting one's head on the floor. This larger wound would have caused unconsciousness instantly and likely death within a couple of minutes. On cross-examination, the medical examiner stated that Mr. Kersch would not have regained consciousness from this injury.
Although the medical examiner did not testify that, after falling to the ground, Mr. Kersch attempted to get up on his hands and kneesin fact, neither side asked him about ithis testimony is consistent with Buzia's confession to that effect.[7] He *1214 ruled out that hitting his head on the floor caused the injury to the left side of Mr. Kersch's head, and he concluded that that injury would have instantly caused unconsciousness and likely death within minutes. Logic dictates that this injury was the final one Mr. Kersch suffered. On the other hand, the laceration and skull fracture on the back of Mr. Kersch's head was consistent with an ax or "a ... rapid fall to the floor." Furthermore, it was "not necessarily likely" that this injury caused death. Unconsciousness could have resulted from this injury, but it was possible that Mr. Kersch regained it. This possibility reinforces Buzia's admission that Mr. Kersch attempted to get up on his hands and knees.
Counsel insisted during oral argument that there is no evidence to suggest that Mr. Kersch pled for his life or screamed for help. The evidence shows that Mr. Kersch was awake and aware during at least part of this ordeal. Whether this state of consciousness lasted minutes or seconds, he was "acutely aware" of his "impending death[ ]." We have upheld the HAC aggravator where the victim was conscious for merely seconds. See Rolling v. State, 695 So.2d 278, 296 (Fla.1997). Competent, substantial evidence supports the trial court's finding.

D. CCP Aggravating Circumstance
In his fourth claim, Buzia challenges the trial court's finding of the CCP aggravator. To support the CCP aggravator, a jury must find "that the killing was the product of cool and calm reflection and not an act prompted by emotional frenzy, panic, or a fit of rage (cold), and that the defendant had a careful plan or prearranged design to commit murder before the fatal incident (calculated), and that the defendant exhibited heightened premeditation (premeditated), and that the defendant had no pretense of moral or legal justification." Jackson v. State, 648 So.2d 85, 89 (Fla.1994) (citations omitted). Buzia argues that the evidence does not support a finding of heightened premeditation. "Premeditated" refers to "heightened premeditation," which is more than what is required to prove first-degree, premeditated murder. Id. at 88. "[D]eliberate ruthlessness" is "necessary to raise ... premeditation above that generally required for premeditated first-degree murder." Fennie v. State, 648 So.2d 95, 99 (Fla.1994) (finding heightened premeditation where the defendant kept the victim waiting for her ultimate fate while he contemplated various methods of execution); see also Walls v. State, 641 So.2d 381, 388 (Fla. 1994) (where the defendant "toyed with [the victim] prior to her death" and "told [the victim] that he was going to `hurt' her," and where the defendant "saw that the killing was a drawn-out affair"). We conclude that Buzia's actions rise to this level of deliberate ruthlessness because (1) he had the opportunity to leave the scene, and (2) he procured a weapon. We address these issues in turn.
First, Buzia had the opportunity to leave the residence with the Kersches' money and valuables without committing further harm. We have "found ... heightened premeditation ... where a defendant had the opportunity to leave the crime scene and not commit the murder but, instead, commit[ted] the murder." Alston v. State, 723 So.2d 148, 162 (Fla.1998) (where the defendant could have stopped at kidnapping and robbery, but instead confined the victim and forced him to contemplate his death while the defendant decided what to do with him) (citing Jackson *1215 v. State, 704 So.2d 500, 505 (Fla.1997)); see also Lynch, 841 So.2d at 372-73 (where the defendant waited "thirty to forty minutes" for the victim to arrive home and, after initially shooting the victim and then dragging her into the apartment, had five to seven minutes in which he could have left the scene and not inflicted the final harm). We conclude in part that, by remaining there and murdering Mr. Kersch, Buzia developed "heightened premeditation."
In its sentencing order the trial court states the following:
The time lapse that occurred between the beating of Thea Kersch and the murder of Charles Kersch allowed [Buzia] to reflect upon his criminal activity and to renounce any further violence. Instead [Buzia] used that extended period of time to ... perfect his plan of attack toward Charles Kersch.
(Emphasis added.) As in Lynch, where the defendant waited "thirty to forty minutes" for the victim to arrive home, 841 So.2d at 373, Buzia had a short period of time during which he could have left the scene and not inflicted further harm. He could have "renounce[d] any further violence" by either leaving or, upon Mr. Kersch's arrival, passively explaining to him what occurred. Yet, when he heard the garage door open, he considered his options and decided to attack Mr. Kersch as well. He calmly chose the criminal option and "perfect[ed] his plan of attack."
Despite this course, Buzia had one final instance where he could have left the scene without committing further harmsthe lapse of time during which he obtained the ax. This interlude was similar to the five to seven minutes in Lynch. Moreover, Buzia could have stopped his criminal activity at the level of assault and robbery. Instead, he remained there, obtained the first ax, and thought about "using it to make `em unconscious." Although he dropped it on the floor, he obtained the other ax and carried out his plan. Buzia could have left the scene without committing further harm, but he remained and committed murder. See Alston, 723 So.2d at 161-62 (emphasizing the defendant's choice between stopping at the level of kidnapping and robbery and murdering the victim).
Most importantly, during this final lapse of time, Buzia procured his own weapon. "[T]he facts supporting [the CCP aggravator] must focus on the manner in which the crime was executed, e.g., advance procurement of weapon, lack of provocation, killing carried out as a matter of course...." Looney v. State, 803 So.2d 656, 678 (Fla.2001) (emphasis added) (quoting Rodriguez v. State, 753 So.2d 29, 48 (Fla.2000)). We have found the CCP aggravator where the defendant procured a weapon beforehand. See, e.g., Rodriguez, 753 So.2d at 46 (where the defendant armed himself with a loaded handgun before proceeding to commit the crime); Sireci v. Moore, 825 So.2d 882, 886 (Fla. 2002) (acquisition of a tire iron); Zakrzewski, 717 So.2d at 492 (the defendant purchased the murder weapon the morning before the murders). However, such procurement need not be that far in advance. In Jackson, 704 So.2d at 505, the defendant went upstairs, obtained a gun, and made a deliberate and conscious choice to shoot a law enforcement officer. We found heightened premeditation because the defendant could have left the scene, but instead purposely returned with the gun to confront the officer. Id. at 505. We have found the CCP aggravator in other cases where the defendant did not procure his own murder weapon before arriving at the scene. See Mason v. State, 438 So.2d 374, 379 (Fla.1983) (where the defendant broke into the victim's home, armed himself with a knife from her kitchen, and attacked the victim as she lay sleeping in bed).
*1216 Although Buzia did not bring his own weapon to the residence, he nevertheless procured one. Because he was performing various jobs for the Kersches at their residence, he knew exactly where to obtain the axes. Like the defendant in Jackson, 704 So.2d at 505, he left the immediate vicinity of the victim, obtained a weapon from a location nearby, and returned to use it on that victim. These actions reflect "a deliberate and conscious choice" to commit murder. Therefore, competent, substantial evidence supports the trial court's finding of the CCP aggravator.
Buzia nevertheless relies on Geralds v. State, 601 So.2d 1157 (Fla.1992). In Geralds, the defendant interrogated the victim's children regarding when family members would be present in the house; brought gloves, a change of clothes, and plastic ties to the house; left his car at a location away from the house; and bound and stabbed the victim. Id. at 1163-64. We held that the trial court erred in finding the CCP aggravator. Id. at 1164. Buzia asserts that this case is "indistinguishable" from Geralds. Although this case and Geralds bear one significant similaritythe weapon used in each crime was a "weapon of opportunity" found in the house rather than one "brought to the scene," id.Geralds is nonetheless distinguishable. First, the defendant in Geralds obtained information about who would be home probably to avoid contact with anyone during the burglary. Id. at 1163. Here, Buzia traveled to the Kersches' residence for the explicit purpose of confronting the Kersches. Second, the defendant in Geralds bound the victim first instead of immediately killing her, which suggests that he might not have planned to kill her. Id. at 1163-64. There was also evidence of a struggle prior to the killing. Id. Here, Buzia never bound Mr. Kersch, and no frenzy or struggle occurred. He immediately attacked him with his fists and, shortly thereafter, struck him with an ax. Therefore, we find Geralds distinguishable.

E. Proportionality
In his fifth claim, Buzia challenges the weight assigned to the aggravating circumstances and argues that the death penalty is not appropriate. The weight to be given aggravating factors is within the discretion of the trial court, and it is subject to the abuse of discretion standard. Sexton v. State, 775 So.2d 923, 934 (Fla.2000). "[D]iscretion is abused only where no reasonable man would take the view adopted by the trial court." Huff v. State, 569 So.2d 1247, 1249 (Fla.1990) (quoting Canakaris v. Canakaris, 382 So.2d 1197, 1203 (Fla.1980)). We affirm the weight accorded an aggravator if based on competent, substantial evidence. Sexton, 775 So.2d at 934. Here, the trial court assigned great weight the prior violent felony, avoid-arrest, HAC, and CCP aggravators. As discussed above, competent, substantial evidence supports the court's finding of these aggravators. We find no abuse of discretion.
We are nevertheless obligated to review each death sentence for proportionality. Anderson v. State, 841 So.2d 390, 407 (Fla.), cert. denied, 540 U.S. 956, 124 S.Ct. 408, 157 L.Ed.2d 292 (2003). In this case, the jury recommended death by a vote of eight to four, and the trial court so sentenced Buzia. The court found and assigned great weight to four aggravating circumstancesprior violent felony, avoid-arrest, HAC, and CCP. We have held that both the HAC and CCP aggravators are "two of the most serious aggravators set out in the statutory sentencing scheme." Larkins v. State, 739 So.2d 90, 95 (Fla. 1999). Furthermore, we have upheld death sentences where the prior violent felony aggravator was the only one present. See, e.g., LaMarca v. State, 785 So.2d 1209, 1217 (Fla.2001); Ferrell v. State, 680 So.2d 390, 391 (Fla.1996).
*1217 The court assigned little weight to two factors under the statutory catchall provision, section 921.141(6)(h), Florida Statutes (2003), specifically Buzia's interaction with the community and his work record. The court also found several nonstatutory mitigators and afforded the weight indicated: influence of a mental or emotional disturbance, not extreme in nature (substantial weight); capacity to appreciate the criminality of one's conduct or to conform his conduct to the requirements of law was impaired, but not substantially (substantial weight); gainful employment (little weight); appropriate courtroom behavior (little weight); cooperation with law enforcement (little weight); difficult childhood (little weight); and remorse (little weight). The court determined that the aggravating circumstances outweighed the mitigation and sentenced Buzia to death.
We find that the sentence is proportional in relation to other death sentences we have upheld.[8]See, e.g., Lynch, 841 So.2d at 377 (finding death sentence proportionate where three aggravators were found applicable to each murderincluding prior violent felony, CCP, and HACand little weight was given one statutory mitigator and eight nonstatutory mitigators were accorded moderate or little weight); Way, 760 So.2d at 920-21 (finding the death penalty proportional where four aggravators were foundprior violent felony, murder committed during the commission of a felony, HAC, and CCPand two statutory mitigators and seven nonstatutory mitigators were found); Cave v. State, 727 So.2d 227, 229 (Fla.1998) (affirming death sentence where four aggravators were foundmurder in the course of a felony (robbery-kidnapping), CCP, HAC, and avoid-arrestand one statutory and eight nonstatutory mitigators were found).

F. The Ring Claim
In his final claim, Buzia argues that Florida's capital sentencing procedures violate Ring v. Arizona, 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002). We have previously rejected this contention. See Jones v. State, 845 So.2d 55, 74 (Fla.2003) (citing Bottoson v. Moore, 833 So.2d 693 (Fla.2002), and King v. Moore, 831 So.2d 143 (Fla.2002)). Additionally, we have repeatedly upheld the constitutionality of Florida's capital sentencing procedures in cases, such as this one, that include the prior violent felony aggravator. See Robinson v. State, 865 So.2d 1259, 1265 (Fla.2004) ("[A] prior violent felony involve[s] facts that were already submitted to a jury during trial and, hence, [is] in compliance with Ring.") (citing Owen v. Crosby, 854 So.2d 182, 193 (Fla.2003)). Accordingly, Buzia is not entitled to relief.

G. Sufficiency of the Evidence
Although Buzia has not challenged the sufficiency of the evidence, we have the independent duty to review the record in each death penalty case to determine whether competent, substantial evidence supports the murder conviction. See Fla. R.App. P. 9.140(i); Davis v. State, 859 So.2d 465, 480 (Fla.2003). After reviewing the record, we conclude that competent, substantial evidence supports Buzia's first-degree murder conviction. At trial, the State presented Buzia's videotaped confession, as well as other strong evidence to establish Buzia's guilt beyond a reasonable doubt. A lab analyst matched the bloody shoe impressions found on the tiles in the foyer, family room, garage hallway, kitchen, *1218 and dinette area in the Kersches' residence to Buzia's shoes. Investigators found a blood smear on the door of the cabinet (which contained the axes) in the garage, and a print examiner concluded that Buzia's palm print was on that cabinet. Furthermore, Buzia's shorts had blood stains on the left front leg from the middle extending to the side seam, and he had bloodstains on his socks and shoes. The blood on his shorts and on one of the axes matched Mr. Kersch. This evidence, combined with Buzia's own confession to the murder, provides sufficient proof to uphold the adjudication of guilt. Accordingly, competent, substantial evidence supports the verdict.

III. CONCLUSION
Having heard oral argument and considered each of the issues raised in this direct appeal, we affirm Buzia's judgment and sentence of death.
It is so ordered.
PARIENTE, C.J., and WELLS, ANSTEAD, LEWIS, QUINCE, CANTERO, and BELL, JJ., concur.
NOTES
[1] Spencer v. State, 615 So.2d 688 (Fla.1993).
[2] The State cross-appealed and raised two issues. However, because we affirm all of the trial court's findings, the State's cross-appeal is rendered moot.
[3] First, Buzia asserts that he never hit Mr. Kersch with a full swing of the ax and simply intended to "knock him silly." Those words, however, arose in response to police questioning, where Buzia hypothetically distinguished between swinging as hard as he could, which he admitted would kill a victim, and hitting someone "enough to ... you know ... to maybe knock silly." Second, he argues that he used the flat side of the ax, not the sharp side, so that he could slow down Mr. Kersch and get out of the house. This statement undermines Buzia's position against the avoid-arrest aggravator.
[4] Buzia makes various other arguments that do not support his position. First, his argument that he left Mrs. Kersch alive as a witness against him has no bearing on whether he killed Mr. Kersch to avoid arrest. Second, the fact that Buzia attempted to duct-tape the door of the bedroom to keep Mrs. Kersch inside suggests that he was trying to keep her from getting outand, presumably, alerting someone. If anything, this evidence indicates that he had an intent to do what he could to avoid detection. Third, Buzia argues that his search for valuables proves that he did not immediately flee the house after assaulting Mrs. Kersch. This fact is irrelevant. The question, again, is whether he killed Mr. Kersch to eliminate him as a witness.
[5] In addition, Buzia argues that the court improperly weighed the HAC aggravator. This Court's function is not to reweigh the evidence but, rather, to determine whether competent, substantial evidence supports the lower court's finding. Owen, 862 So.2d at 698. Our discussion of this argument properly belongs in our proportionality analysis.
[6] Buzia repeats his argument that, instead of intending to kill Mr. Kersch, he only struck him hard enough to "knock him silly." However, that statement again misrepresents the facts. See supra note 3. Second, he argues that his intent was to render the Kersches incapacitated so that he could rob them, escape, and "get high." That admission essentially concedes the State's position regarding the avoid-arrest aggravator but does not address the manner of the killing.
[7] The only conflict in the testimony concerns whether Mr. Kersch was moaning and groaning when Buzia left the residence. Buzia told the police that he heard such noises, but the medical examiner stated that Mr. Kersch would not have regained consciousness from the injury caused by the ax on the left side of his head.
[8] Buzia cites various cases based on the assumption that only one aggravator in this case has merit. Because competent substantial evidence supports the trial court's finding of four aggravating circumstances, and because it properly assigned great weight to those aggravators, these cases do not apply.