[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-13562

_____

D.C. Docket No. 5:13-cv-00167-MW-EMT

MARK ALLEN GERALDS,

Petitioner - Appellant,

versus

ATTORNEY GENERAL, STATE OF FLORIDA,
SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,

Respondents - Appellees.

_____

Appeal from the United States District Court
for the Northern District of Florida

_____

(May 12, 2021)

Before ROSENBAUM, NEWSOM, and BRASHER, Circuit Judges.

PER CURIAM:

A Florida jury convicted Mark Allen Geralds of first-degree murder, armed robbery, burglary of a dwelling, and theft of an automobile. The state trial court

sentenced Geralds to death, and the Florida Supreme Court vacated his sentence on direct appeal. Following additional penalty-phase proceedings, a jury again recommended a death sentence, which the trial court imposed and the Florida Supreme Court affirmed.

Geralds unsuccessfully challenged his conviction and sentence during state postconviction review and then filed a federal habeas petition in the Northern District of Florida. Among other claims, his petition asserts that the state courts unreasonably rejected his claims of prosecutorial misconduct in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972); ineffective assistance of counsel in violation of *Strickland v. Washington*, 466 U.S. 668 (1984); and infringement of due process by wrongly denying for-cause challenges to two prospective jurors. The district court denied his petition, and Geralds appealed. After careful consideration, and with the benefit of oral argument, we affirm.

## I.     FACTS AND PROCEDURAL HISTORY

On February 7, 1990, a Florida jury convicted Geralds of first-degree murder, among other offenses, for the killing of Tressa Lynn Pettibone. One year earlier, on February 1, 1989, Pettibone's eight-year-old son found her body when he came home from school. She had been stabbed multiple times, and bruises from blunt trauma covered the upper half of her body. Blood patterns showed that she had

struggled with her attacker in at least three different parts of the home's kitchen and dining area. The medical examiner determined that her wrists had been bound with a plastic tie for at least twenty minutes before she died. At trial, family members testified that a herringbone chain necklace, red-frame Bucci sunglasses, and a Mercedes car were missing from the home.

Geralds was a carpenter who had done work on the Pettibones' home. About a week before the crime, he encountered her and her two children at a mall. At that time, she mentioned that her husband was out of town on business. Geralds later approached her son in the video arcade and asked when he and his sister left and came back from school. Geralds also asked when their father would return from his trip.

A collection of circumstantial evidence linked Geralds to the events of February 1. That afternoon, Geralds had pawned a gold herringbone chain necklace. Lab testing later showed that a stain on the necklace was blood, consistent with Pettibone's blood type. The police also found plastic ties in Geralds's car that matched the ties found on her wrists, as well as shoes in his residence that were consistent with tracks identified at the crime scene. Finally, Geralds had gone to his grandfather's house on the day of the crime to take a shower; while leaving, he said that he was taking a pair of sunglasses to some friends. A witness testified that Geralds gave her a pair of red Bucci sunglasses in late January or early February

3

1989. And as we have mentioned, Pettibone's family reported that red Bucci sunglasses were missing from their home after Pettibone was killed. After the State rested its case, Geralds moved for judgment of acquittal, arguing that the evidence was insufficient to support the charges against him. The court denied that motion, and the defense immediately rested without calling any witnesses or otherwise presenting evidence.

The jury found Geralds guilty of first-degree murder, armed robbery, burglary of a dwelling, and theft of an automobile.[1] It recommended a death sentence for the murder conviction. The trial judge agreed, finding that four statutory aggravating factors and no mitigating factors were satisfied, and he sentenced Geralds to death.

The Florida Supreme Court affirmed Geralds's convictions but remanded the case for resentencing following a new hearing on application of the death penalty. *Geralds v. State* ("*Geralds I*"), 601 So. 2d 1157, 1164 (Fla. 1992). The court held that the trial judge had erred in allowing the State to refer to Geralds's prior convictions during the original penalty-phase proceedings. *See id.* at 1161–63. However, the court rejected Geralds's arguments about errors from the trial's guilt phase, including—as relevant here—that the court had improperly denied two for-

---

[1] The Mercedes was found in the parking lot of a school near the Pettibones' home.

cause challenges to prospective jurors who were exposed to pretrial media coverage. *See id.* at 1159.

Following a second penalty-phase hearing, a jury again recommended the death penalty, and on April 13, 1993, the trial judge sentenced Geralds to death. The Florida Supreme Court affirmed this sentence, and the U.S. Supreme Court denied review of its decision. *Geralds v. State* ("*Geralds II*"), 674 So. 2d 96, 105 (Fla.) (per curiam), *cert. denied*, 519 U.S. 891 (1996).

Geralds moved for postconviction relief before the sentencing court. In an amended motion, dated January 25, 2002, he raised twenty-six claims for relief. On February 12, 2003, the court summarily denied twenty of those claims and set an evidentiary hearing for the remaining six. Among other arguments, the remaining claims alleged that Geralds's trial counsel, who died before the evidentiary hearings began, was unconstitutionally ineffective for failing to present evidence from the crime scene and for failing to investigate and present witnesses. Geralds's amended motion also alleged that the prosecution had suppressed material exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83, and knowingly presented or failed to correct false testimony at trial in violation of *Giglio v. United States*, 405 U.S. 150.

Following two evidentiary hearings, the sentencing court denied Geralds's remaining claims in a series of orders issued in 2005 and 2006. The court also denied

several motions for reconsideration of these orders.  On September 16, 2010, the

Florida Supreme Court affirmed these orders and denied an original petition for writ

of habeas corpus.  *Geralds v. State* ("*Geralds III*"), 111 So. 3d 778, 810 (Fla. 2010)

(per curiam).[2]

On April 29, 2013, Geralds filed a petition for writ of habeas corpus in the

Northern District of Florida.  He asserted eight grounds for relief.  The district court

denied the petition in an opinion issued May 13, 2019.  In that opinion, the court

held that Geralds was not entitled to an evidentiary hearing on his claims.  However,

the court issued a certificate of appealability under 28 U.S.C. § 2253(c)(2) as to three

claims:   (1) that counsel was unconstitutionally ineffective for failing to present

crime-scene evidence at his original trial, (2) that counsel was ineffective for failing

to investigate and present witnesses, and (3) that the state trial court erred in denying

his for-cause challenges to the two prospective jurors.  Geralds moved to alter the

judgment and expand the certificate of appealability, but the district court denied his

motion.  He filed a timely notice of appeal.

On appeal, Geralds moved to expand the certificate of appealability.  We

granted this motion in part, issuing a certificate of appealability as to three additional

---

[2] Geralds later filed a successive motion for postconviction relief based on *Hurst v. Florida*, 577 U.S. 92 (2016), and *Hurst v. State*, 202 So. 3d 40 (Fla. 2016).  The state trial court denied his motion, and the Florida Supreme Court affirmed.  *Geralds v. State*, 237 So. 3d 923 (Fla. 2018) (per curiam).  The U.S. Supreme Court denied Geralds's petition for writ of certiorari.  *Geralds v. Florida*, 139 S. Ct. 324 (2018).

claims: (1) whether the State violated *Brady* in failing to disclose reports or handwritten notes prepared by the Florida Department of Law Enforcement, (2) whether the State violated *Giglio* in permitting its investigator to testify that he had confirmed the alibi of another suspect, and (3) whether the State violated *Giglio* in permitting the investigator to testify that Geralds's left shoe had tested positive for blood.

## II.    STANDARDS OF REVIEW

We review de novo the district court's denial of a habeas petition. *Ward v. Hall*, 592 F.3d 1144, 1155 (11th Cir. 2010). Under 28 U.S.C. § 2254(d), as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), we may not grant habeas relief to a state prisoner unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (quoting 28 U.S.C. § 2254(d)(1), (2)). The state court's findings of fact are presumed to be correct, and the petitioner must rebut that presumption by clear and convincing evidence. *Consalvo v. Sec'y for Dep't of Corr.*, 664 F.3d 842, 844 (11th Cir. 2011) (per curiam); *see* 28 U.S.C. § 2254(e)(1).

The Supreme Court has explained that "clearly established Federal law" under § 2254(d)(1) means the holdings, rather than the dicta, of its opinions. *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003). A state-court decision can be "contrary to" this established law in two ways: (1) if the state court arrives at a conclusion on a question of law opposite that of the Supreme Court; or (2) if the court confronts facts that are "materially indistinguishable" from relevant Supreme Court precedent but reaches a different result. *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000). "A state-court decision that correctly identifies the governing legal rule but applies it unreasonably to the facts" of a particular case is an "unreasonable application" of clearly established law. *Id.* at 407–08.

To determine whether the state court's decisions involved an "unreasonable application" of established law, we look to the reasons provided by the last state court to address an issue. *Wilson v. Sellers*, 138 S. Ct. 1188, 1191–92 (2018). A decision is reasonable "so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, 562 U.S. 86, 101 (2011) (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). It is not enough to show that the state court's application of law to fact led to an incorrect result. *Lockyer*, 538 U.S. at 75. Only if the state court's application of law is "objectively unreasonable" may we grant the habeas petition on this basis. *Id.*

### III.    DISCUSSION

Geralds has received a certificate of appealability on six claims:  (1) whether the State violated *Brady* by failing to disclose records from the Florida Department of Law Enforcement, (2) whether the State violated *Giglio* by presenting false testimony about blood on Geralds's shoe, (3) whether the State violated *Giglio* by presenting false testimony about confirming another suspect's alibi, (4) whether Geralds's counsel was unconstitutionally ineffective for failing to present evidence from the crime scene, (5) whether Geralds's counsel was unconstitutionally ineffective for failing to investigate and present a witness who sold Geralds a herringbone necklace before the crime, and (6) whether the state court violated due process by denying Geralds's for-cause challenges to two prospective jurors.  We address each claim in turn.

#### 1.   Claim of undisclosed evidence

Geralds argues that the prosecution failed to disclose reports and handwritten notes from the Florida Department of Law Enforcement ("FDLE"), violating *Brady v. Maryland*, 373 U.S. 83.  The documents at issue include (1) a lab report containing blood typing analysis by FDLE analyst Shirley Zeigler (Defense Exhibit 20), (2) handwritten notes indicating that a bloodied handkerchief was found on top of a sewing machine at the crime scene (Defense Exhibit 28), (3) handwritten notes concerning the location of fingerprints and palmprints at the crime scene (Defense

Exhibit 31), (4) handwritten notes discussing hair evidence collected from Pettibone's body, including from her left hand, which did not match Geralds's hair samples (Defense Exhibit 34), and (5) a lab report by FDLE analyst Larry Smith, which indicates that the hair collected from Pettibone did not match samples from Geralds (Defense Exhibit 36).[3]

With regard to Zeigler's and Smith's lab reports, the district court held that Geralds had failed to rebut by clear and convincing evidence the Florida Supreme Court's findings that the reports had been disclosed. As for the handwritten notes about the hair and print analysis, the district court observed that the state court had not found that these documents were suppressed. Even so, the district court concluded that Geralds had not shown that the state court erred in concluding that the outcome at trial would not have been different had the allegedly suppressed evidence been disclosed.

In *Brady*, the Supreme Court held that due process requires the prosecution, upon request, to disclose evidence that is favorable to a defendant. 373 U.S. at 87. This principle extends to both impeachment and exculpatory evidence. *United States v. Bagley*, 473 U.S. 667, 676 (1985). And it includes evidence known to

---

[3] The exhibit numbers reflect the labels assigned at the evidentiary hearings on Geralds's motion for postconviction relief. Geralds's brief also lists Defense Exhibits 23 and 32 in this claim, but he makes no argument about them. Those exhibits are an evidence log sheet with some handwritten notes and a description of evidence submitted for analysis, respectively.

police investigators but not to a prosecutor. *See Kyles v. Whitley*, 514 U.S. 419, 438 (1995). Thus, to comply with *Brady*, a prosecutor must determine what evidence is known to other government actors so that the prosecutor can disclose it, if necessary. *Id.* at 437. For a *Brady* violation to exist, the suppressed evidence must be material, meaning that there is a reasonable probability that the evidence, assessed cumulatively, would have changed the outcome at trial. *See id.* at 433–35.

On appeal, Geralds argues that the state court's decisions were based on an unreasonable determination of the facts and were both contrary to and an unreasonable application of clearly established federal law.[4] Below, we consider these arguments with respect to each piece of evidence. We conclude by addressing Geralds's argument that this evidence is material when viewed collectively. *Zeigler lab report*

First, the Zeigler lab report (Defense Exhibit 20), which is dated April 3, 1989, indicates that the blood on a handkerchief from the crime scene was found to be of Type O. It further states that neither Geralds nor Pettibone had that blood type, but

---

[4] Regarding the alleged legal errors, Geralds contends that the Florida Supreme Court and the district court improperly analyzed his *Brady* claim by requiring a showing of diligence. This argument draws on an issue left unanswered in *Strickler v. Greene*, 527 U.S. 263 (1999), namely, "the impact of a showing by the State that the defendant was aware of the existence of the documents in question and knew, or could reasonably discover, how to obtain them." *See id.* at 288 n.33. However, we need not reach this issue because the Florida Supreme Court did not reject the *Brady* claims that remain in this case because of a diligence requirement. *See Geralds III*, 111 So. 3d at 786–88, 791.

11

Kenneth Dewey Mayo, another suspect in the case, did. The report also indicates that no human bloodstaining "could be demonstrated" on two tennis shoes.

In rejecting Geralds's *Brady* claim as to the Zeigler report, the Florida Supreme Court concluded,

> At best, Geralds has only demonstrated that the record is ambiguous as to whether Zeigler's report was disclosed. He has not, however, carried his burden of demonstrating that the State suppressed Zeigler's report. In reviewing the State's discovery produced on April 14, 1989, it is not clear whether Zeigler's report was included. Although Zeigler is listed as a person known to have information that may be relevant, Zeigler's report is not specifically identified. At the evidentiary hearing on September 23, 2003, [prosecutor Joe] Grammer testified, "I'm absolutely positive that [defense counsel] Bob Adams had this report before he talked to Shirley Zeigler in preparation for the trial." However, at the evidentiary hearing on February 25, 2004, Grammer testified that he did "not have a clear memory" of providing the report to the defense, but believed that "if we got it, which we did, we shared it with Bob." In looking at his file marked "lab reports," Grammer found Zeigler's report. Grammer further testified that the report is the type of document that he would have provided to the defense and that it was possible that if the State did not have it on April 14, 1989, it was given to the defense afterwards. James Appleman, state attorney and Grammer's co-counsel, testified during the evidentiary hearing that Zeigler's report was available to trial counsel.

*Geralds III*, 111 So. 3d at 788.

Geralds offers five reasons why the Florida Supreme Court's conclusion that he failed to show that the State had not provided the Zeigler report was based on an

12

unreasonable determination of the facts. First, he contends that this report was not enumerated on the State's list of discovery responses, which generally identified FDLE reports—among other documents—that the prosecutors provided. The record generally supports this contention, with one exception. The State's June 1, 1989, supplemental discovery filing did not enumerate each of the documents it contained; it stated only that it enclosed approximately 543 pages of "investigative material." And, unlike the State's other discovery responses, the record does not include the documents that were enclosed with this filing. Given the June 1, 1989, discovery response, we cannot conclude that it was unreasonable for the state court to determine that prosecutors had provided the Zeigler report to defense counsel, even though the report was not listed on any of these filings.[5]

Second, Geralds points out that during the February 25, 2004, evidentiary hearing on his motion for postconviction relief, Grammer testified on cross-examination that he did not have an independent memory of providing the Zeigler report to Geralds's trial counsel.[6] At the earlier evidentiary hearing, on September

---

[5] At the evidentiary hearings on Geralds's motion for postconviction relief, Grammer described the June 1, 1989, set of documents as material from the early stages of the investigation into the crime. Geralds argues that this testimony was an "admission" that this discovery did not include the Zeigler report. But Grammer's testimony broadly characterizing the material does not rule out that the Zeigler report was enclosed with it.

[6] Appleman, the state attorney, testified at the evidentiary hearings that the Zeigler report would have been provided to defense counsel, but he also stated that he did not have a specific memory of providing it because discovery was the responsibility of Grammer, his assistant.

23, 2003, Grammer had said he was certain that the report had been provided. But at the second hearing, Grammer's testimony on direct examination was less conclusive:

> Q. Do you have any recollection as to why you would have listed Ms. Ziggler's [*sic*] name as a possible witness?
>
> A. If we had the report or if her name had been provided by law enforcement.
>
> Q. Is this report the type of document that you would have provided to the Defense?
>
> A. Yes.
>
> Q. Do you believe that it was provided to the Defense?
>
> A. You know, I do not have a clear memory of this one, but I believe if we got it, which we did, we shared it with Bob.
>
> Q. Looking at Pages 2246 and 2247, did you see this report listed?
>
> A. No.
>
> Q. Is it possible that it did not, it just did not get typed in in [*sic*] your list of attachments?
>
> A. It's possible that we didn't have it that day, we gave it to him afterwards. It's possible that it did not make it on the list. I don't—it's all speculation, I don't know.
>
> Q. Is it your practice to disclose the name of someone who would have information and then withhold—
>
> A. No.
>
> Q. —an exhibit or—

A.    No.

Q.    —document?

A.    No.  That does not make much sense.

On cross-examination, Grammer subsequently testified,

Q.    Do you have any independent recollection in this particular case that, and we will go through the specific documents, but that everything you received was given to [Mr. Adams]?

. . .

A.    The only thing that I don't have a specific memory—well let me rephrase that.  My memory for many of these documents is based upon the written record, and those two lab reports are the only ones that I don't show on the written record and that I don't have an independent recollection of.  That would be the Larry Smith report and I think the first Shirley Ziggler [*sic*] report.

Despite Grammer's hesitation on cross-examination at the second evidentiary hearing, we cannot say that this record provides clear and convincing evidence that the Zeigler report was suppressed.  Even if he lacked a specific recollection of having disclosed the report some fifteen years earlier, Grammer's testimony about his discovery practices render not unreasonable the state court's finding that the report was not suppressed.

Third, Geralds notes that his trial counsel's file did not contain a copy of the Zeigler report.[7] But the state trial court found that this file was incomplete in that it did not include everything in Geralds's trial counsel's files. Geralds has not shown by clear and convincing evidence that this finding of fact was incorrect. *See Bui v. Haley*, 321 F.3d 1304, 1312 (11th Cir. 2003) ("[Section 2254(e)(1)'s] presumption of correctness applies equally to factual determinations made by state trial and appellate courts."). So once again, we cannot say that the state court's conclusion that the Zeigler report was produced was unreasonable.

Fourth, Geralds points to his counsel's cross-examination at trial of a different FDLE analyst, Laura Rousseau, as evidence that he was unaware of the Zeigler report. That exchange went as follows:

> Q.    Ma'am, what do you mean by presumptive tests?
>
> A.    That's just a pre-test that it could be blood.
>
> Q.    And in your training and experience, those presumptive tests which is a pre-test meaning it could be blood, would that differentiate between human and fish blood?
>
> A.    No, it would not.
>
> Q.    To your knowledge was any further testing done with regard to those items in front of you?

---

[7] Although the files of Geralds's trial counsel (Defense Exhibit 53) are not part of the record before this Court, the State does not dispute that they do not include the Zeigler report.

A.    Not to my knowledge, I don't know. I have not seen the shoes since then.

Geralds argues that if his trial counsel had known of the Zeigler report, he would not have asked Rousseau if there was follow-up testing. We cannot conclude that that is necessarily the case. While Geralds's counsel's cross-examination of Rousseau could suggest that he was unaware of the Zeigler report, it does not unambiguously evidence that conclusion. Rather, he may have asked about any follow-up analysis—knowing that it, in fact, existed—to undermine Rousseau's testimony by drawing attention to the preliminary and inconclusive nature of her findings.

Fifth and finally, Geralds observes that his trial counsel's theory of the case was grounded in the existence of another perpetrator, so he contends that his attorney would have referred to the Zeigler report had he known of it. Zeigler testified at trial, and Geralds's counsel did not ask about her analysis of the handkerchief during cross-examination. It's not clear, however, whether he attempted to ask about it. That cross-examination ended as follows:

> Q.    Okay. Oh. One more thing. We've got these things you have identified in evidence. Did you test anything else?
>
> MR. APPLEMAN [the prosecutor]:    Objection, Your Honor. Exceeds the scope of direct examination.
>
> THE COURT:  I'll sustain that objection.
>
> Q. (Mr. Adams continuing)    You're the blood expert, aren't you?

17

A.    Yes, I am.

Q.    Serology.

A.    That's correct.

Q.    Okay.  I'll have to leave that one hanging.  Thank you very much.

MR. APPLEMAN:  I have no questions for the witness and ask that she be excused and allowed to return to Jacksonville.

THE COURT:  You may step down and you're free to go.

MR. ADAMS:  Well, Judge, she's from Jacksonville, could we have her stay here through the next break and with the Court's permission I would liek [*sic*] to speak to her briefly.

THE COURT:  All right.

Geralds's trial counsel did not bring up Zeigler again before closing arguments.  But during his closing argument, he stated,

> . . . That's a lack of evidence.  Laura Russo [*sic*] was called.  And talked about.  I only see one . . . [ellipsis in original] well, here's another one.  The Nikes.  Oh, yeah, there was blood on them, I identified a little area that might be blood.  What do you do with them?  Sent them to the lab.  Did you hear Ms. Zigler [*sic*] say, yes, there is blood on those shoes?  No.  Did you hear Ms. Zigler [*sic*] say I checked those shoes in Jacksonville laboratory?  No.  You didn't hear any testimony about that.  Or did Ms. Zigler [*sic*] test those shoes and find no blood?  You're left in the realm of guessing.  And even Ms. Russo [*sic*] at that time told us about that presumptive test which was really a pre test which could show blood and it couldn't even tell whether it was human or fish blood because she was asked

18

> that by me. The answer was she couldn't even tell the difference on that pre test.

And later, he again portrayed Zeigler's analysis as incomplete, noting that she neither studied the prevalence of certain blood enzymes that she identified on the herringbone necklace within the general population nor conducted DNA testing.

Contrary to Geralds's argument, we cannot conclude that his trial counsel's lack of reference to the Zeigler report necessarily occurred because he was unaware of it. As we recount above, counsel's closing arguments suggest a strategy of pointing to an incomplete investigation by law enforcement. He may have concluded that not bringing up the Zeigler report would support that strategy. Alternatively, he may have sought to ask about the report in his final question on cross-examination but was stymied by the prosecutor's successful objection. At any rate, we cannot say that this record presents clear and convincing evidence that the Florida Supreme Court erred in finding that the Zeigler report was not suppressed.

Nor do Geralds's five arguments, taken collectively, clear that bar. During cross-examination, Zeigler testified that she had written two reports in this case, including the April 3, 1989, report at issue here. Geralds's trial counsel did not file a motion for mistrial or continuance after this exchange. In contrast, Geralds's trial counsel immediately moved for a mistrial when he learned during trial that the State had not disclosed the handwritten notes of analyst Rousseau.

We note, as well, that Zeigler testified again at the resentencing proceedings. In that testimony, unlike at the original trial, she discussed the handkerchief and how it had a small blood stain, "about maybe the size of a tip of a finger."  Geralds's trial counsel, who continued to represent him during those proceedings, questioned Zeigler on recross examination immediately after that discussion.  Nothing in his questioning suggests any surprise from or interest in testimony about the handkerchief.  *Handwritten notes discussing "blooded handkerchief"*

Second, a set of handwritten notes (Defense Exhibit 28) indicates that a "blooded handkerchief" was found on a sewing machine at the crime scene.  The state courts did not address a *Brady* claim as to this document in their rulings on Geralds's motion for postconviction relief.  Assuming without deciding that Geralds exhausted his *Brady* claim as to this document, our review is de novo.  *See Rompilla v. Beard*, 545 U.S. 374, 390 (2005).

There is conflicting evidence as to whether this document was provided to Geralds's trial counsel.  At the September 2003 evidentiary hearing on Geralds's motion for postconviction relief, Grammer testified that he did not recall providing defense counsel with this exhibit and that he did not think that prosecutors had possession of it.  But at the later hearing, in February 2004, Grammer testified that he located the exhibit among records of the 543 pages of "investigative material"

20

provided in discovery and that it is the type of document that would have been disclosed to defense counsel.

Regardless, Geralds has not shown an entitlement to relief on *Brady*'s materiality requirement—i.e., a reasonable probability that the verdict would have been different had the evidence been disclosed. *Rimmer v. Sec'y, Fla. Dep't of Corr.*, 876 F.3d 1039, 1054 (11th Cir. 2017). This document adds nothing of substance beyond the blood analysis in the *Zeigler* report, which the state courts determined had been disclosed, and the fact that investigators found a small amount of blood on a handkerchief at the crime scene does not undermine the record of guilt in this case. Indeed, as discussed above, Geralds's counsel was not interested in discussing the handkerchief when it came up during the resentencing proceedings.

### i. Handwritten evidence list

The third piece of evidence at issue in Geralds's *Brady* claim is handwritten notes logging evidence collected from the crime scene (Defense Exhibit 31). The notes provide some explanation of where certain evidence—including fingerprints, palmprints, and shoe tracks—was located within the Pettibones' house. The Florida Supreme Court analyzed this document in a short discussion that also addressed several other exhibits. *See Geralds III*, 111 So. 3d at 791. That discussion concluded that "Geralds failed to demonstrate either that the information was suppressed by the State or that the information was material." *Id.* Because of the disjunctive logic of

this phrasing and because the court was addressing several pieces of evidence at once, it is not clear whether the court's ruling as to Defense Exhibit 31 in particular was grounded in lack of suppression, immateriality, or both. *See id.*

Grammer's testimony at the September 2003 evidentiary hearing suggests that this exhibit was not provided to defense counsel. Assuming that this exhibit was suppressed, Geralds has still not shown that it is material under *Brady*. Geralds concedes that his counsel had access to the FDLE report showing that fingerprints and palmprints taken at the crime scene did not belong to him. Any new information in these notes—concerning the location of fingerprints, palmprints, and shoe tracks taken from the crime scene—is not more probative of Geralds's or someone else's guilt than the fact that the prints were not Geralds's, which was disclosed. Indeed, Geralds does not explain how this exhibit might have made a difference in the outcome at trial.[8]

### ii. Smith lab report

The fourth piece of evidence at issue in Geralds's *Brady* claim is a lab report by FDLE analyst Smith (Defense Exhibit 36). This report, which was dated January 25, 1990, concluded that debris and hairs from Pettibone's body, including from her

---

[8] Geralds asserts that the Florida Supreme Court did not analyze *Brady*'s materiality prong. With respect to this exhibit, as well as the two that we analyze below, the state court's conclusion on materiality—though brief—is still entitled to deference under AEDPA. *See Rimmer*, 876 F.3d at 1055.

left hand, did not match samples from Geralds. The Florida Supreme Court addressed this document together with the handwritten evidence list discussed above. *See Geralds III*, 111 So. 3d at 791. As with that document, it is not clear whether the court reached its conclusion that the State did not violate *Brady* with respect to this exhibit on the grounds of lack of suppression, immateriality, or both. *See id.*

Assuming that the Florida Supreme Court reached its conclusion because it found that the State had not suppressed the Smith report, Geralds would need to demonstrate by clear and convincing evidence that this finding was incorrect.[9] Many of Geralds's arguments as to the Smith report overlap with his arguments on the Zeigler report. He contends that the report does not appear on any of the prosecution's discovery responses. He also refers to Grammer's testimony that he lacked an "independent recollection" of providing the Smith report to Geralds's trial counsel. And Geralds states that the Smith report, like the Zeigler report, was not contained in trial counsel's files. Geralds also adds two arguments specific to the Smith report. First, he contends that if his trial counsel had received the Smith report, he would have would have used it in support of his theory that someone else

---

[9] As the Florida Supreme Court noted, the lower state court did not address this document in its orders denying Geralds's motion for postconviction relief. *Geralds III*, 111 So. 3d at 791. Nevertheless, the presumption of correctness under 28 U.S.C. § 2254(e)(1) extends to the appellate court's factual determinations. *Bui*, 321 F.3d at 1312.

23

struggled with Pettibone and therefore committed the crime. Second, Geralds notes that Smith's report was issued only four days before trial and suggests that the State may have accidentally failed to disclose it.

Several of these arguments are unavailing for the same reasons as with the Zeigler report. For example, the state trial court found that trial counsel's files were incomplete. And, as we have noted, counsel's strategy at trial emphasized the State's lack of investigation. Even if the Smith report included findings that were helpful to Geralds's case, counsel might have believed it better not to draw attention to additional lab work done by the FDLE.

Nevertheless, the Smith report presents a closer question than the Zeigler report did. Smith's name was disclosed as a witness on January 24, 1990. The record contains two discovery responses after that date. The first one disclosed other potential witnesses but did not state that it enclosed any documents. The second one enclosed a different lab report but not the Smith report. And unlike with the Zeigler report, there was no omnibus discovery filing dated after January 25, 1990, that might have enclosed the Smith report without listing it.

During the evidentiary hearings on Geralds's motion for postconviction relief, Grammer stated that he might have hand-delivered the Smith report to Geralds's trial counsel. The record demonstrates that, at least some of the time, Grammer composed formal discovery filings even when he provided documents by hand. But

not always.  Grammer recalled hand-delivering a different lab report to Geralds's trial counsel during jury selection, and, as with the Smith report, the record does not contain a formal discovery filing for that report.  Thus, Grammer did not always draft formal discovery filings when he exchanged lab reports at the last minute before trial.  And he testified that Smith's report is "the type of item that would have been disclosed as soon as we received it" and that he "would not have withheld his report."  Thus, while the supporting evidence is thin, to the extent that the state court found that the Smith report was not suppressed, AEDPA's standard of review— requiring us to find factual error by clear and convincing evidence—once again precludes us from concluding that the state court erred in this finding.

If, instead or in addition, the Florida Supreme Court reached its decision because it determined that the Smith report was immaterial under *Brady*, Geralds has not shown that this result was objectively unreasonable.  The record provides support for the state court to have concluded that there was not a reasonable probability that Geralds would not have been convicted, even if the evidence from the Smith report had been presented at trial.  The State presented evidence that Geralds had done work on the Pettibones' house and had inquired about a week before the crime about where the various Pettibones would be during the time that the crime was committed.  Plus, on the very afternoon of the murder, Geralds pawned a herringbone necklace with blood on it matching Pettibone's type, and the

25

Pettibones reported that a herringbone necklace had been stolen during the robbery; Geralds had told his father that same day after the murder and robbery that he needed to bring a friend sunglasses, and the Pettibones reported the same type and color of sunglasses missing from their home; in Geralds's car, police found the same plastic ties used to tie Pettibone's wrists and shoes; and shoe tracks found at the crime scene were consistent with shoes found in Geralds's residence. While the fact that the hair in Pettibone's hand was not Geralds's may have provided some contrary evidence, Smith's report did not rule out a match with other members of the Pettibone household, and under the circumstances, we cannot conclude that it was objectively unreasonable for the state court to determine that there was not a reasonable probability that the verdict would have been different had the Smith report been disclosed.

### iii.  Handwritten notes on hair samples

The final portion of Geralds's *Brady* claim relates to handwritten notes discussing hair samples taken from Pettibone's body, including from her left hand (Defense Exhibit 34). They appear to be written by Smith in preparation of his report. The notes indicate that these hairs are "microscopically different from" a hair sample from Geralds. The Florida Supreme Court addressed this exhibit together with the handwritten evidence log and the Smith lab report. *See Geralds III*, 111 So. 3d at 791. As the record suggests these handwritten notes were not

26

disclosed to Geralds's counsel, we understand the Florida Supreme Court to have rejected the *Brady* claim as to this exhibit on grounds of immateriality. *See id.*

For the same reasons we must find that the state court's resolution of the claim involving the Smith lab report survives AEDPA scrutiny, we must conclude that the state court's determination concerning the handwritten notes does. As we have noted, the record of circumstantial evidence—Geralds's inquiries concerning the Pettibones' whereabouts, the herringbone necklace with Pettibone's blood type on it, the sunglasses, shoe tracks, and plastic ties—support the conclusion that there was not a reasonable probability that Geralds would not have been convicted, even if the hair evidence had been presented at trial.

### iv.  Cumulative analysis of materiality

Finally, Geralds argues that *Brady*'s materiality prong requires analyzing the set of evidence collectively. This principle, which is clearly established under Supreme Court precedent, applies to only evidence that was suppressed. *See Kyles*, 514 U.S. at 436. The Florida Supreme Court correctly identified this rule, *see Geralds III*, 111 So. 3d at 787, and the court's application of it was not objectively unreasonable.[10]

---

[10] To the extent that the district court relied on the state court's determination as to the sufficiency of the evidence from *Geralds I*, we agree with Geralds that *Brady*'s materiality prong requires analyzing the undisclosed evidence, rather than just the evidence presented at trial.

As noted above, the Florida Supreme Court's finding that the Zeigler report was not suppressed is entitled to deference. So the cumulative analysis extends only to the remaining evidence. Even assuming that the four other exhibits—the Smith report and the handwritten notes on a "blooded handkerchief," evidence log, and hair samples—were suppressed, we conclude that when they are considered together, the Florida Supreme Court's conclusion as to immateriality remains objectively reasonable. As our previous discussion indicates, the notes discussing the "blooded handkerchief" and the locations of fingerprints (Defense Exhibits 28 and 31) do not contain significant information beyond what is in the corresponding lab reports that Geralds's counsel received. It makes no difference to our conclusion whether we assess these exhibits by themselves or alongside other evidence. That leaves the two exhibits discussing hair samples: the handwritten notes about them and the Smith report (Defense Exhibits 34 and 36). Any extra information contained in the handwritten notes, as opposed to Smith's report, is relatively minor; the report summarizes the conclusion that the evidence taken from Pettibone "contained no hairs like the hairs in the head or pubic hair standards . . . from Geralds." Analyzing the materiality of these documents jointly does not change our conclusion.[11]

---

[11] As he had argued before the state courts and district court, Geralds also contends that the prejudice from his *Brady* and *Strickland* claims should have been analyzed collectively. Although he cites a Tenth Circuit decision, *Cargle v. Mullin*, 317 F.3d 1196, 1206–07 (10th Cir. 2003), he provides no Supreme Court precedent in support of this proposition. Under AEDPA, then, this rule was not clearly established, and the state court's decision was not contrary to law. *See* 28 U.S.C. § 2254(d)(1). In *Cargle*, the Tenth Circuit reached the merits of a cumulative error claim,

2.  Claims of false testimony by the prosecution

In his second category of claims, Geralds argues that the State violated *Giglio v. United States*, 405 U.S. 150, in presenting two lines of false testimony by its investigator, Bob Jimerson,[12] during the second trial.  First, Jimerson testified that a chemical test for blood reacted positively to Geralds's left shoe, even though lab testing later failed to demonstrate human bloodstaining.  Second, Jimerson testified that he had confirmed that William Pelton, another suspect, was at work on the day Pettibone was killed, even though Jimerson's notes show that Pelton could have left work.  The district court denied relief on both issues, concluding that Geralds had not shown that the state court's decisions were not entitled to deference.

Due process bars a prosecutor from knowingly presenting false evidence at trial and from failing to correct false testimony, even when unsolicited.  *See Giglio*, 405 U.S. at 153.  This rule applies to impeachment and exculpatory evidence alike.

---

which it analyzed de novo.  *See* 317 F.3d at 1206–07.  However, we do not reach de novo review because the state court correctly identified the clearly established law applicable to Geralds's claims.  *See Rimmer*, 876 F.3d at 1054–55.

Even if we did, though, Geralds would not fare any better.  As we explain later, the record supports the conclusion that counsel made a strategic decision to forfeit any benefits from putting on an affirmative case, including offering evidence like the lab reports (as opposed to engaging in cross-examination only), so that he could take advantage of a procedural maneuver known as the "sandwich," which allowed him to present closing argument both before and after the State did. We conclude that competent attorneys could have reasonably chosen such a strategy, such that there is no *Strickland* error to evaluate cumulatively.

[12]  The record also contains several instances where Jimerson's name is spelled "Jimmerson."  We use the single-"m" spelling of Jimerson's last name because that is the spelling he himself used on the investigation report that he wrote in 1989.

*Bagley*, 473 U.S. at 676. And as with *Brady* claims, the evidence must be material to constitute a constitutional violation. *See Giglio*, 405 U.S. at 154. In this context, materiality means that "there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *See United States v. Agurs*, 427 U.S. 97, 103 (1976).

We first address Jimerson's testimony about the blood testing and then turn to his testimony about Pelton's alibi.

### i. Testimony about blood on left shoe

Geralds contends that Jimerson testified falsely on direct examination during the resentencing proceedings when he discussed a preliminary test that indicated blood on Geralds's left shoe. The exchange between James Appleman, the state attorney, and Jimerson elicited the following testimony:

> Q.    With respect to those shoes were you present when testing was done on the bottom of the shoes?
>
> A.    Yes, sir.
>
> Q.    Were they sprayed with what is known as Luminol?
>
> A.    Luminol and ---
>
> MR. ADAMS:  I object.  He's not qualified, Your Honor.
>
> THE COURT:  Overrule the objection.
>
> MR. APPLEMAN:  You may answer.

30

THE WITNESS:  It is a chemical test to detect human blood or blood.

Q.    (Mr. Appleman continuing) Was those shoes sprayed?

A.    Yes, sir.

Q.    And did the test come positive, showing there was blood on the shoes?

A.    Positive on the left shoe.

Q.    Now, you couldn't tell whether it was fish blood, animal blood or what kind of blood it may be?

A.    No, sir.

Q.    You had a positive reaction for blood?

A.    That's correct.

However, follow-up testing by FDLE analyst Zeigler failed to demonstrate the presence of human bloodstaining on either shoe. Nevertheless, the Florida Supreme Court concluded that Jimerson had testified to what he personally observed and that Geralds had not shown that this testimony was false. *Geralds III*, 111 So. 3d at 792–93.

Geralds argues that the state court's analysis of this testimony was premised on an incorrect rule of law—that evidence needed to be "clearly false" under *Giglio*. Citing the Supreme Court's decisions in *United States v. Bagley*, 473 U.S. 667, and *Alcorta v. Texas*, 355 U.S. 28 (1957) (per curiam), he contends that clearly

established federal law holds that testimony can violate due process when it is simply misleading.

To the extent Geralds argues that *Bagley* and *Alcorta* held that misleading but literally correct material testimony necessarily violates *Giglio*, we disagree. Geralds quotes language in which the *Bagley* plurality credited the misleading effect of a prosecutor's "technically correct" discovery response, but a majority of the Court did not join that part of the opinion. *Compare Bagley*, 473 U.S. at 684 (plurality opinion), *with id.* at 685 (White, J., concurring). Thus, these statements are not clearly established federal law. *See Lockyer*, 538 U.S. at 71–72. And while *Alcorta* discussed testimony that "gave the jury [a] false impression," the opinion also explained that the witness had "been allowed to testify falsely." 355 U.S. at 31–32. Accordingly, the Florida Supreme Court's decision in *Geralds III* was not "contrary to" Supreme Court precedent on a pure question of law. *See Williams*, 529 U.S. at 405–06.

Nor was *Geralds III* otherwise "contrary to" clearly established law because it reached a conclusion opposite the Supreme Court in the face of "materially indistinguishable" facts. *See id.* at 406. We recognize that the line between "false testimony" and testimony that gives a "false impression" is not always clear-cut. But to resolve this appeal, it suffices to observe that the facts here do not resemble *Alcorta*. In that case, the only witness to a murder testified that he and the victim

32

were not in love with each other and that they had not dated. *Alcorta*, 355 U.S. at 30. The defendant was the victim's husband, and his defense to the death penalty required showing that he had caught his wife and the witness kissing. *Id.* at 28–29. In fact, the witness and victim were engaged in an affair and had sexual intercourse on multiple occasions. *Id.* at 30–31. By contrast, as the state court noted, Jimerson testified accurately as to his personal observations of the Luminol blood testing. *See Geralds III*, 111 So. 3d at 792–93. Even if we agreed that Jimerson's testimony was misleading, it remains distinguishable from the situation in *Alcorta*.

Thus, to demonstrate that legal error entitles him to habeas relief, Geralds must show that the state court's decision on this issue was objectively unreasonable. *See Williams*, 529 U.S. at 407–09. He cannot do so. The Supreme Court has explained that the purpose of *Brady*—the genesis of *Giglio* claims—"is not to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur." *Bagley*, 473 U.S. at 675. In allowing Jimerson to testify accurately as to his observations of the preliminary blood test, the Florida Supreme Court reasonably balanced this principle with the requirements of due process. *See Geralds III*, 111 So. 3d at 792–93. As a result, we

33

are constrained to conclude that the state court's decision in this regard was not error under AEDPA.[13]

### ii. Testimony about William Pelton's alibi

Geralds also contends that Jimerson violated *Giglio* by testifying that he had confirmed the alibi of William Pelton, who was another suspect. Pelton, a friend of Geralds, was working on a remodeling project at Club LaVela in Panama City Beach. During the resentencing proceedings, Jimerson testified on redirect examination that he had verified with Gregg Toriac, the Club's general manager, that Pelton was at work on the day that Pettibone was killed:

> Q.    Do you know any reason why Mr. Toriak [*sic*] would lie about Mr. Pelton's presence at work the day of this crime?
>
> A.    No reason.
>
> Q.    As a matter of fact he provided you a document; didn't he, saying that I know on February 1st he, William Pelton[,] was here from 8 a.m. to 12 and from 1 'til 6?
>
> A.    That's correct.
>
> Q.    So, you verified that William Pelton was at work on the date of this crime?

---

[13] In his opening brief, Geralds does not argue that the Florida Supreme Court's decision as to Jimerson's testimony about the blood testing was based on an unreasonable determination of the facts. As the State points out, the record contains evidence that the failure to demonstrate blood in Zeigler's follow-up testing could indicate that the preliminary testing "consumed everything" and was not false. For this reason, to the extent that Geralds argues in his reply brief that Luminol testing is not reliable, we conclude that he has not shown that the state court's factual determination that Jimerson testified accurately was an unreasonable one.

A.    Yes, sir.

The record on Geralds's motion for postconviction relief contains Jimerson's notes from his interview with Toriac.  Those notes state,

> Gregg Toriac
>
> Middlebrooks & myself were discussing William Pelton (01-26-90) & we know he would leave work alot & stopped at Radio Shack & would bring in a reciept [*sic*] to show or cover why he was missing or gone so long.
>
> Dave Meadows did write his time in on Feb. 1, 1989 but he is like us wouldn't really know if William stayed or left that day.

Meadows, who worked under Toriac in a management position at Club LaVela, testified at the evidentiary hearing.  He described the Club's timekeeping procedures as informal:  he would record who showed up for work each morning, but there was no timecard system.  He explained that the Club's records might credit someone for working from 8 to 12 and 1 to 6, but that person could have come and gone from the workplace during those hours.  Pelton, for example, often left to go to Radio Shack.

The Florida Supreme Court concluded that Geralds had failed to show that Jimerson did not confirm Pelton's alibi.  *Geralds III*, 111 So. 3d at 792.  The court reasoned that Jimerson's interview with Toriac "only indicates that Toriac, not Jimerson, did not confirm Pelton's alibi."  *Id.*  Geralds argues that this result was based on an unreasonable determination of the facts.  He views the notes from Jimerson's interview with Toriac as showing that nobody could have verified

35

Pelton's alibi.  In this way, according to Geralds, the notes "directly contradicted" Jimerson's testimony.

Even if we accepted Geralds's understanding of Jimerson's interview notes—as proof that nobody could have verified Pelton's alibi—we would not conclude that he is entitled to relief on this claim.  That's because Jimerson's testimony, taken as a whole, was not inconsistent with this understanding.  Jimerson said he verified that Pelton "was at work on the date of this crime," not that Pelton remained at the workplace for the entire time.  And he had previously acknowledged, on cross-examination by Geralds's counsel, that there was no record of Pelton staying at Club LaVela during those hours.  Because Geralds has not shown that Jimerson testified falsely, we cannot say the state court wrongly denied this claim.

3. Claims of ineffective assistance of counsel

Next, Geralds contends that his trial counsel was unconstitutionally ineffective during the guilt phase of his trial in failing to present certain evidence from the crime scene and in failing to investigate and present testimony of a jeweler who had sold Geralds a herringbone necklace before Pettibone was killed.  As to both claims, the district court concluded that Geralds had not shown that the state court erred in determining that his counsel's performance was not deficient.  Regarding the jeweler's testimony, the court also concluded Geralds had not shown

that the state court erred in holding that his counsel's actions, even if deficient, did not prejudice his defense.

The Sixth Amendment guarantees the right to reasonably effective assistance of counsel for defendants in criminal proceedings. *See Strickland*, 466 U.S. at 687. Under *Strickland*, the petitioner must show both that his attorney's performance was deficient and that this deficiency prejudiced his defense. *Id.* Each prong of this test is a mixed question of law and fact. *Id.* at 698.

The performance prong requires demonstrating that counsel's performance was objectively unreasonable, as determined by prevailing professional norms. *Id.* at 688. Counsel must exercise sufficient skill and knowledge for the defendant's trial to be "a reliable adversarial testing process." *Id.* The Supreme Court has recognized that this standard encompasses a wide range of tactical decisions; accordingly, the standard is "highly deferential." *See id.* at 688–89. "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. The upshot is that the court must apply a "strong presumption" that counsel's performance was reasonable. *Id.*

The prejudice prong requires showing a reasonable probability that the outcome would have been different absent counsel's errors. *Id.* at 694. The court

must consider prejudice in light of the totality of the evidence before the decisionmaker. *Id.* at 695. "When a defendant challenges a death sentence such as the one at issue in this case, the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Id.*

The Supreme Court has explained that *Strickland* is a difficult test to satisfy. *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010). And when federal courts review state courts' decisions regarding counsel's performance, AEDPA makes the "highly deferential" *Strickland* standard "doubly so." *Harrington*, 562 U.S. at 105.

As we have noted, the defense at Geralds's original trial rested its case immediately, without presenting witnesses or other evidence. We first address Geralds's argument as to counsel's failure to present evidence and then turn to his argument that counsel failed to investigate and present a witness.

### i. Failure to present evidence

Geralds's first *Strickland* claim is that his counsel was ineffective for failing to present certain physical evidence from the crime scene during his trial. The evidence at issue is as follows: (1) the hair collected from the crime scene and victim's body, which did not match Geralds's hair, (2) the handkerchief with blood that did not match Geralds's or the victim's blood type, (3) fingerprints and

38

palmprints, including on the victim's jewelry box, which did not match Geralds or any member of the Pettibone family, (4) a photograph of a shoeprint, which Geralds's expert said "appears to" depict a different tread from that on his own sneakers, (5) the conclusion of an FDLE analyst that no blood was found on the driver's side floor mat of the victim's car, (6) the Zeigler report's conclusion that no blood was ultimately demonstrated on Geralds's Nike sneakers, (7) shoe impressions in what looked like dry paint in the Pettibones' carport, which appeared to resemble the bloody shoe print inside the house,[14] and (8) a broken fingernail, which came from the victim rather than Geralds.  Geralds also contends that his attorney should have elicited additional testimony that no blood was apparent on Geralds when he arrived at his grandfather's house on the day Pettibone was killed.  Given the State's testimony that the perpetrator engaged in a struggle with Pettibone and then dragged her body across the floor, Geralds argues that this additional evidence would have suggested that he was not guilty.[15]

---

[14] Geralds argues that this evidence would have shown that the tread design of his shoes was common.

[15] Geralds also argues that counsel should have made clear that the gloves that Geralds's grandfather saw him wearing were driving gloves, which did not cover his fingertips.  Geralds's grandfather testified to this effect on direct examination, but the prosecutor stated during closing argument that the gloves were the "kind that don't leave fingerprints in housesWe note that the district court rejected Geralds's *Strickland* argument that counsel was ineffective for failing to object to this statement, and Geralds did not receive a certificate of appealability to proceed with his appeal on this basis. **]**

As we have noted, Geralds's trial counsel died before the evidentiary hearings on his motion for postconviction relief. His testimony is therefore not part of this record. Geralds also emphasizes that his attorney was ill with acute Hepatitis B in the summer of 1989 and confined to bedrest. Although counsel informed the court of his illness and offered to withdraw, the trial judge encouraged him to continue representing Geralds if he felt able to do so. In September, his physician restricted him to a part-time work schedule. Geralds suggests that this illness explains why trial counsel did not take more than six depositions, which did not conclude any FDLE lab analysts.

In denying this claim, the Florida Supreme Court observed that the strategy of Geralds's counsel was to create doubt at trial by emphasizing the State's lack of evidence. *Geralds III*, 111 So. 3d at 794. The court pointed to counsel's closing argument, which referred to the lack of evidence of blood in the car, the non-definitive showing of blood on Geralds's sneakers, the absence of testimony about Geralds's clothes being bloody, the commonness of the shoes' tread design, the broken fingernail, and the lack of fingerprint and hair evidence, despite the samples having been taken from Geralds. *Id.* at 794–95. The court then rejected Geralds's *Strickland* argument "that trial counsel should have presented evidence of this lack of evidence instead of merely arguing in closing that there was no evidence." *Id.* at 795. The court underscored that closing argument, while not itself evidence, is a

40

"powerful tool" and concluded that counsel did not perform deficiently by highlighting the holes in the State's case in closing argument, rather than through Geralds's own witnesses. *See id.* As an example, the court noted that by bringing up the broken fingernail in closing argument, counsel was able to suggest that it belonged to a different perpetrator, rather than—as the FDLE analyst had concluded—to Tressa Pettibone herself. *See id.* But even if counsel's performance was deficient, the court further concluded that Geralds's argument failed on *Strickland*'s prejudice prong because "counsel referenced the lack of evidence in closing argument and the jury was aware of it." *Id.*

Geralds contends that the Florida Supreme Court's conclusion was both contrary to and an unreasonable application of clearly established federal law. He does not, however, identify a question of pure law on which the state court contradicted Supreme Court precedent, nor does he identify a "materially indistinguishable" set of facts from such case law. *See Williams*, 529 U.S. at 405–06. Accordingly, to prevail on this claim, he must show that the state court's decision "involved an unreasonable application" of Supreme Court decisions. *See id.* at 406–09; 28 U.S.C. § 2254(d)(1).

The heart of Geralds's argument is that, on the performance prong, the state court erred in treating closing argument as a constitutionally adequate substitute for presenting exculpatory evidence. He further contends that, in failing to present this

41

evidence at trial, his counsel misunderstood a fundamental point of law—that attorneys' arguments before the jury are not evidence. However, as the broken fingernail example shows, rebutting opposing counsel's case by argument rather than evidence can be an effective approach. And *Strickland* affords attorneys wide latitude to make these kinds of strategic decisions. *See Horton v. Zant*, 941 F.2d 1449, 1460–61 (11th Cir. 1991). For this reason, we have rejected applying bright-line rules to determine what constitutes reasonable performance by counsel. *Chandler v. United States*, 218 F.3d 1305, 1317 (11th Cir. 2000) (en banc).

Even assuming without deciding that we accept Geralds's argument that the state court erred, then we would review the claim de novo. *McGahee v. Ala. Dep't of Corr.*, 560 F.3d 1252, 1266 (11th Cir. 2009). And we may affirm on any basis supported by the record, even one on which the district court did not rely. *Trotter v. Sec'y, Dep't of Corr.*, 535 F.3d 1286, 1291 (11th Cir. 2008). Here, at oral argument, the State noted that at the time of Geralds's original trial, Florida law permitted defense counsel to make a "sandwich" closing argument, addressing the jury both first and last, in cases where the defendant presents no testimony except his or her own. *See Boyd v. State*, 200 So. 3d 685, 705 (Fla. 2015) (discussing Fla. R. Crim. P. 3.250).[16] Geralds's counsel opted for that procedure during the original trial,

---

[16] In 2007, at the direction of the Florida Legislature, the Florida Supreme Court amended Florida Rule of Criminal Procedure 3.250 to eliminate the option of making "sandwich" closing

42

giving both the first closing argument and a final rebuttal. As we have noted, choosing the "sandwich" required counsel to forgo putting on a case. This was a classic strategic choice. Considering the benefit of having the first and last word before the jury, balanced against the limited exculpatory value of the evidence that Geralds cites in this claim, we cannot say that counsel's performance, including in investigation and preparation for trial, "amounted to incompetence under 'prevailing professional norms.'" *Harrington*, 562 U.S. at 105 (quoting *Strickland*, 466 U.S. at 690); *see also Ward*, 592 F.3d at 1164. This is particularly so in view of the theory counsel pressed here: that the State performed a slipshod, incomplete investigation.

We are not persuaded by Geralds's arguments to the contrary. First, he contends that counsel could have presented this evidence, namely the blood typing of the handkerchief and the fingerprint analysis, while maintaining his "sandwich" closing arguments. But counsel's cross-examination of Zeigler, which we have quoted earlier, shows that this was not so. When Geralds's attorney asked Zeigler if she had tested anything else, the prosecutor successfully objected to the question as outside the scope of direct examination. Second, he emphasizes the "critically exculpatory" value of the handkerchief with blood that did not match Geralds's or Tressa Pettibone's blood type. As we concluded previously, though, that

---

arguments. *See In re Amends. to the Fla. Rules of Crim. Proc.-Final Arguments*, 957 So. 2d 1164, 1166–67 (Fla. 2007) (per curiam).

investigators found a fingertip-sized amount of another person's blood on a handkerchief at the crime scene does not undermine the record of guilt in this case.[17]

Given our conclusion that Geralds's counsel did not perform deficiently, we do not address *Strickland*'s prejudice prong.

### *ii. Failure to investigate and present witness Anthony Swoboda*

Geralds also argues that his trial counsel was ineffective for failing to investigate and present testimony by Anthony Swoboda, a jeweler who had sold him a herringbone necklace before Tressa Pettibone's death. In Geralds's view, Swoboda's testimony would have suggested that the necklace that Geralds pawned was not taken from Pettibone.

Swoboda worked at a jewelry store in the local mall. At the evidentiary hearings on Geralds's motion for postconviction relief, he testified that he had sold Geralds a gold herringbone chain, with nothing particularly distinctive about it. He explained that there was no paperwork documenting the sale; to avoid recording sales tax, he sold it "under the table" outside of his employment at the jewelry store.

---

[17] In a supplemental brief filed after oral argument, Geralds asserts that the blood type identified on the handkerchief did not match "any of the victim's family members." He provides no citation to the record supporting this assertion, which did not appear in his opening or reply brief. The Zeigler report compared the blood type on the handkerchief to that of Geralds, Tressa Pettibone, and another suspect (Kenneth Dewey Mayo), but it did not analyze the blood types of other members of the Pettibone family. The apparent lack of support for Geralds's representation is significant because, as Jimerson testified at Geralds's second trial, Tressa Pettibone's son had a nosebleed the night before the crime occurred.

He guessed that he probably sold it for around $225. In his brief, Geralds points out that this testimony could have explained why he asked the pawn shop owner whether the herringbone necklace was real gold, as the jury heard at Geralds's original trial.

A police investigator and Geralds's trial counsel had both interviewed Swoboda. At the evidentiary hearing, Swoboda testified that he understood that Geralds's attorney was likely to call him to testify at trial. Indeed, Geralds named Swoboda as a potential witness in a filing served on January 15, 1990. But he was not called to testify.

The Florida Supreme Court denied this *Strickland* claim, holding that Geralds had failed to demonstrate either deficient performance or prejudice. *Geralds III*, 111 So. 3d at 797. On both prongs, the court emphasized that Geralds had not explained how Tressa Pettibone's blood type ended up on the necklace that he pawned. *See id.* Because Swoboda's testimony would not have undermined that aspect of the State's case, the court held that trial counsel's failure to call him as a witness was neither deficient performance nor prejudicial to Geralds. *See id.* And on the prejudice prong, the court concluded that "[a]t best, Swoboda's testimony only establishes that Geralds purchased an unrelated herringbone necklace at a time unrelated to the murder." *Id.* (We separately note that calling Swoboda would have meant forgoing the "sandwich" argument.).

On appeal, Geralds raises four arguments for why he is entitled to relief on this claim. First, he challenges the state court's factual determination that the necklace Geralds purchased from Swoboda was unrelated to the events in this case. He points to Swoboda's testimony at the evidentiary hearings and the notes from law enforcement's interview with him. Those notes recorded Swoboda's statement that the necklace was a thin chain sold "under the table" to Geralds. He also refers to a document containing the Pettibone family's description of a missing herringbone necklace, and he claims that this description did not match the herringbone necklace shown to the jury at trial. And he contends that the blood tests of the necklace were not conclusive.

But this record does not show that the Florida Supreme Court's factual determination was unreasonable. *See* 28 U.S.C. § 2254(d)(2). Swoboda's testimony and the notes from law enforcement are not inconsistent with the conclusion that Geralds purchased an unrelated herringbone necklace from Swoboda. And nothing in the family's list of missing jewelry indicates that the necklace presented at trial does not match its description of a "Herringbone necklace[,] thick gold[;] comes down into a v shape but doesn't lay flat." Plus, the jury might not have found Swoboda's testimony credible, had he testified. Most importantly, Geralds does not point to any evidence in support of his argument that the blood tests were unreliable.

46

Even if the tests were not definitive, the state court's interpretation of them was not unreasonable.

Second, Geralds challenges the state court's determination that he pawned any necklace. When Geralds testified at his resentencing trial, he stated that he had never gone to the pawn shop or pawned a gold necklace. He also stated that he did not carry a wallet. He now points to a note handwritten by Jimerson that is dated March 7, 1989, and states "collect pawn ticket from wallet of Geralds." Geralds also observes that he did not have a wallet when he was arrested and argues that the date of Jimerson's note undermines the State's evidence about the pawn shop.

At Geralds's original trial, Detective Paul Winterman from the Panama City Police Department testified that he went to the pawn shop on March 1, 1989, after learning that a necklace had been pawned on February 1. Two members of the Pettibone family accompanied the detective and identified the necklace as having belonged to Tressa Pettibone; at that time, they also noticed the bloodstain on the necklace. The officer obtained two pawn tickets from the shop, and the pawn broker testified that Geralds had received those tickets when he brought in the gold herringbone necklace on February 1, 1989, and presented his Florida driver's license as identification. The tickets listed Geralds's address, birthdate, driver's license number, and physical description. The pawn broker also testified that he recognized Geralds from that encounter. At Geralds's resentencing trial, Jimerson summarized

47

this evidence.  He also testified that he had collected a matching pawn ticket from Geralds's wallet, at the jail, on March 7, 1989.

Based on this record, Geralds has not shown that the state court's decision was based on an unreasonable determination that he pawned a necklace.  A jail log does indicate that Geralds did not have a wallet when he was booked on March 1, 1989.  While the log and Jimerson's handwritten note may raise questions about the sequence of events that led officers to the pawn shop, they do not render unreasonable under AEDPA's standard of review the state court's factual determination that Geralds pawned a necklace.  In particular, they do not undermine the evidence from trial that pawn tickets from the transaction listed Geralds's personal information or that the pawn broker identified Geralds from their encounter on February 1, 1989.  We cannot say the state court erred on this basis.

Third, on *Strickland*'s performance prong, Geralds contends that it was objectively unreasonable for his trial counsel not to call Swoboda to testify.  In Geralds's view, Swoboda's testimony would have created reasonable doubt as to whether Geralds pawned Pettibone's necklace.  But, as the Florida Supreme Court reasoned, even if Swoboda had been called, Geralds does not explain how he would have overcome the evidence of blood on the necklace.  *See Geralds III*, 111 So. 3d at 797.  And as the State observes in its brief, Swoboda testified at the evidentiary hearings that the necklace he sold Geralds was not distinctive, suggesting that he

would not have been able to identify it later. Given these observations, we cannot say the state court's conclusion on the performance prong was objectively unreasonable.

Fourth, and finally, Geralds argues that he was prejudiced by the failure to call Swoboda as a witness because counsel could have argued that "the entire recovery and identification of the herringbone necklace was fabricated." But this ignores the Florida Supreme Court's reasoning that Geralds did not discredit the blood stain matching Pettibone's blood type. *See id.* This reasoning was not objectively unreasonable.[18]

### 4. For-cause challenges to two prospective jurors

Finally, Geralds argues that the state courts erred in rejecting his argument that two members of the jury pool at his original trial should have been dismissed for cause. He contends that those two prospective jurors, Michael Moss and Stephen Farrell, were unable to set aside their knowledge of the case from pretrial media coverage and their relationships within the community, and that the state courts' decisions to the contrary were based on an unreasonable determination of the facts. The district court concluded that Geralds did not demonstrate entitlement to relief

---

[18] As we have noted previously, the Florida Supreme Court did not err under AEDPA by not evaluating the materiality of Geralds's *Strickland* and *Brady* claims together.

on this issue. But the court expressed concern that the state trial court did not grant the for-cause challenges, given that Geralds was charged with a capital offense.

Due process requires an impartial decisionmaker. *See Turner v. Louisiana*, 379 U.S. 466, 471–72 (1965). In the context of a criminal jury trial, jurors must therefore base their verdict on the evidence presented in the courtroom during trial. *See id.* at 472–73; *Holbrook v. Flynn*, 475 U.S. 560, 567 (1986). But this principle does not mean that jurors must have zero prior exposure to the facts and issues involved in a case. *Irvin v. Dowd*, 366 U.S. 717, 722 (1961). Instead, the trial judge must determine whether the juror can set aside his initial impression or opinion about the case. *See id.* at 723.

Ordinarily, the question of whether a juror is unconstitutionally biased is a mixed question of law and fact, and the trial court's ruling should stand unless it is manifest error. *Id.* But in the context of federal habeas review of a state-court conviction, the standard is even more deferential. The question "is plainly one of historical fact: did a juror swear that he could set aside any opinion he might hold and decide the case on the evidence, and should the juror's protestation of impartiality have been believed[?]" *Patton v. Yount*, 467 U.S. 1025, 1036 (1984).

The first prospective juror, Moss, was a U.S. Air Force officer who also worked as a weatherman for the local news channel. He had read in the news about Tressa Pettibone—who she was and how she was killed—around the time of the

crime, though he said he had not discussed it with his coworkers.  While he did not recall reading anything about Geralds, he had heard coverage on television and the radio about a jail escape attributed to Geralds.  Asked whether he could base his decision as a juror solely upon the evidence presented at trial, he said he could.  But he added that he was not sure whether he "could totally set everything aside, because [he had] heard it."  He explained that he could not forget things he had read or heard about the case, but he could base his judgment solely on the evidence at trial.  Still, he conceded that the outside information might enter his mind to a small degree.

Geralds's trial counsel challenged Moss for cause.  He argued that Moss's work for the television channel was concerning, given extensive coverage of the case in the media.  And he underscored that Moss was unable to say that he could totally set aside his outside knowledge.  The trial court reserved ruling on the challenge but later denied it.  Nevertheless, Moss did not end up on the jury.

The second prospective juror, Farrell, had a sister-in-law who lived a few blocks from the Pettibones' house, where the crime occurred.  The proximity had caused concern for his sister-in-law.  The Pettibone children had played with his sister-in-law's kids, and he said he may have been over to his sister-in-law's house while the Pettibone children were there.  Furthermore, Farrell's wife and her sister had conversations about what happened, which Farrell sometimes overheard.  He remembered some details about a body and later a vehicle being found, but he said

he did not pay close attention to the media.  He stated that he could give Geralds the presumption of innocence to which he was entitled as defendant.  And despite his sister-in-law's concern, Farrell did not think he would be uncomfortable sitting on the jury.

Geralds's counsel challenged Farrell for cause because of his family's connection to the Pettibones and because of the concern his family members expressed at the time of the incident.  The trial judge denied the challenge.  Having used up his initial allotment of peremptory challenges, Geralds's counsel later sought two more peremptory challenges, which the court denied.  Farrell ended up on the jury.

On direct appeal, the Florida Supreme Court held that the trial judge did not abuse his discretion in refusing to strike Moss and Farrell for cause.  *Geralds I*, 601 So. 2d at 1159.  The court noted that their responses on voir dire indicated that they could set aside what they knew from pretrial media coverage and render a verdict based on the evidence at trial.  *Id.*

Geralds contends that the Florida Supreme Court's analysis in *Geralds I* was based on an unreasonable determination of the facts.  We disagree.  Moss stated multiple times during voir dire that he would base any decision as a juror solely on the evidence presented at trial.  Similarly, Farrell said he would be able to accord Geralds the presumption of innocence.  Farrell also said that he had not reached any

conclusions about Geralds from talking with his wife and sister-in-law. Geralds has not shown clear and convincing evidence that the state courts erred in crediting these statements.

## IV. CONCLUSION

For the reasons set forth in this opinion, we affirm the district court's judgment denying Geralds's habeas petition.

**AFFIRMED.**